[884 NE2d 1005, 855 NYS2d 6]

SOTERIOS (STEVE) TZOLIS et al., Individually and in the Right and on Behalf of Pennington Property Co. and Another, et al., Respondents, v HERBERT WOLFF et al., Defendants, and PARKWAY LLC et al., Appellants.

Argued January 3, 2008; decided February 14, 2008

**POINTS OF COUNSEL**

*Loeb & Loeb LLP,* New York City (*David M. Satnick, David B. Eizenman* and *John A. Piskora* of counsel), for appellants. I. The legislative history of the Limited Liability Company Law makes clear the Legislature's intent that members do not have the right to assert derivative claims. (*Riley v County of Broome,* 95 NY2d 455; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Hoffman v Unterberg,* 9 AD3d 386; *Lio v Mingyi Zhong,* 10 Misc 3d 1068[A], 2006 NY Slip Op 50016[U]; *Schindler v Niche Media Holdings,* 1 Misc 3d 713; *Bischoff v Boar's Head Provisions Co., Inc.,* 436 F Supp 2d 626; *Caprer v Nuss-*

*baum,* 36 AD3d 176; *People v Finnegan,* 85 NY2d 53; *Nachman Corp. v Pension Benefit Guaranty Corporation,* 446 US 359; *People v Korkala,* 99 AD2d 161.) II. The Appellate Division's decision constitutes judicial legislation. III. The express language of the Limited Liability Company Law precludes derivative actions by LLC members. (*Klebanow v New York Produce Exch.,* 344 F2d 294; *Riviera Congress Assoc. v Yassky,* 18 NY2d 540; *Stark v Goldberg,* 297 AD2d 203; *State of New York v Patricia II.,* 6 NY3d 160; *Matter of M.B.,* 6 NY3d 437; *People v Santi,* 3 NY3d 234; *City of New York v Stringfellow's of N.Y.,* 96 NY2d 51; *Nathanson v Nathanson,* 20 AD3d 403; *Lio v Mingyi Zhong,* 10 Misc 3d 1068[A], 2006 NY Slip Op 50016[U]; *Matter of Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art,* 93 NY2d 729.)

*Feldman Weinstein & Smith LLP,* New York City (*Eric S. Weinstein* and *Yong Hak Kim* of counsel), for respondents. I. This case arising in equity, the Supreme Court's jurisdiction is granted by the New York State Constitution; the Legislature cannot abridge that power. (*Brinckerhoff v Bostwick,* 88 NY 52; *Ross v Bernhard,* 396 US 531; *Ettlinger v Persian Rug & Carpet Co.,* 142 NY 189; *Klebanow v New York Produce Exch.,* 344 F2d 294; *Riviera Congress Assoc. v Yassky,* 18 NY2d 540; *Strain v Seven Hills Assoc.,* 75 AD2d 360; *Salm v Feldstein,* 20 AD3d 469; *Lio v Mingyi Zhong,* 10 Misc 3d 1068[A], 2006 NY Slip Op 50016[U]; *Waters & Co. v Gerard,* 189 NY 302; *Batas v Prudential Ins. Co. of Am.,* 281 AD2d 260.) II. Soterios Tzolis has a direct claim. (*Bonham v Coe,* 249 App Div 428, 276 NY 540; *Breed v Barton,* 54 NY2d 82; *Eisenberg v Central Zone Prop. Corp.,* 306 NY 58; *Alpert v 28 Williams St. Corp.,* 63 NY2d 557; *Matter of Willcox v Stern,* 18 NY2d 195; *James v Lewis,* 135 AD2d 785.)

### OPINION OF THE COURT

SMITH, J.

We hold that members of a limited liability company (LLC) may bring derivative suits on the LLC's behalf, even though there are no provisions governing such suits in the Limited Liability Company Law.

### Facts and Procedural History

Pennington Property Co. LLC was the owner of a Manhattan apartment building. Plaintiffs, who own 25% of the membership interests in the LLC, bring this action "individually and in the

right and on behalf of" the company. Plaintiffs claim that those in control of the LLC, and others acting in concert with them, arranged first to lease and then to sell the LLC's principal asset for sums below market value; that the lease was unlawfully assigned; and that company fiduciaries benefitted personally from the sale. Plaintiffs assert several causes of action, of which only the first two are in issue here: The first cause of action seeks to declare the sale void, and the second seeks termination of the lease.

Supreme Court dismissed these causes of action. It held that they could not be brought by plaintiffs individually, because they were "to redress wrongs suffered by the corporation" (12 Misc 3d 1151[A], 2006 NY Slip Op 50851[U], *4). It also held, following *Hoffman v Unterberg* (9 AD3d 386 [2d Dept 2004]), that "New York law does not permit members to bring derivative actions on behalf of a limited liability company" (*id.* at *5). The Appellate Division, concluding that derivative suits on behalf of LLCs are permitted, reversed (39 AD3d 138 [1st Dept 2007]), and granted two defendants permission to appeal on a certified question. We now affirm the Appellate Division's order.

## Discussion

The issue is whether derivative suits on behalf of LLCs are allowed. The basis for appellants' argument that they are not is the Legislature's decision, when the Limited Liability Company Law was enacted in 1994, to omit all reference to such suits. We hold that this omission does not imply such suits are prohibited. We base our holding on the long-recognized importance of the derivative suit in corporate law, and on the absence of evidence that the Legislature decided to abolish this remedy when it passed the Limited Liability Company Law in 1994.

## I

The derivative suit has been part of the general corporate law of this state at least since 1832. It was not created by statute, but by case law. Chancellor Walworth recognized the remedy in *Robinson v Smith* (3 Paige Ch 222 [1832]), because he thought it essential for shareholders to have recourse when those in control of a corporation betrayed their duty. Chancellor Walworth applied to a joint stock corporation—then a fairly new kind of entity—a familiar principle of the law of trusts: that a beneficiary (or "cestui que trust") could bring suit on behalf of a trust when a faithless trustee refused to do so. Ruling that

shareholders could sue on behalf of a corporation under similar circumstances, the Chancellor explained:

> "The directors are the trustees or managing partners, and the stockholders are the cestui que trusts, and have a joint interest in all the property and effects of the corporation. . . . And no injury the stockholders may sustain by a fraudulent breach of trust, can, upon the general principles of equity, be suffered to pass without a remedy. In the language of Lord Hardwicke, in a similar case [*Charitable Corp. v Sutton*, 2 Atk 400, 406 (Ch 1742)], 'I will never determine that a court of equity cannot lay hold of every such breach of trust. I will never determine that frauds of this kind are out of the reach of courts of law or equity; for an intolerable grievance would follow from such a determination.' " (3 Paige Ch at 232.)

Eventually, the rule that derivative suits could be brought on behalf of ordinary business corporations was codified by statute (*see* Business Corporation Law § 626 [a]). But until relatively recently, no similar statutory provision was made for another kind of entity, the limited partnership; again, the absence of a statute did not prevent courts from recognizing the remedy. In *Klebanow v New York Produce Exch.* (344 F2d 294 [2d Cir 1965, Friendly, J.]), the Second Circuit Court of Appeals held that limited partners could sue on a partnership's behalf. For the Second Circuit, the absence of a statutory provision was not decisive because the court found no "clear mandate *against* limited partners' capacity to bring an action like this" (*id.* at 298 [emphasis added]). We agreed with the holding of *Klebanow* in *Riviera Congress Assoc. v Yassky* (18 NY2d 540, 547 [1966, Fuld, J.]), relying, as had Chancellor Walworth long before, on an analogy with the law of trusts:

> "There can be no question that a managing or general partner of a limited partnership is bound in a fiduciary relationship with the limited partners . . . and the latter are, therefore, *cestuis que trustent*. . . . It is fundamental to the law of trusts that *cestuis* have the right, 'upon the general principles of equity' (*Robinson v. Smith*, 3 Paige Ch. 222, 232) and 'independently of [statutory] provisions' (*Brinckerhoff v. Bostwick*, 88 N. Y. 52, 59), to sue for the benefit of the trust on a cause of action which

belongs to the trust if 'the trustees refuse to perform their duty in that respect'. (*Western R. R. Co. v. Nolan*, 48 N. Y. 513, 518 . . . .)"

After *Klebanow* and *Riviera* were decided, the Partnership Law was amended to provide for derivative actions by limited partners (*see* Partnership Law § 115-a [1]).

We now consider whether to recognize derivative actions on behalf of a third kind of entity, the LLC, as to which no statutory provision for such an action exists. In addressing the question, we continue to heed the realization that influenced Chancellor Walworth in 1832, and Lord Hardwicke 90 years earlier: When fiduciaries are faithless to their trust, the victims must not be left wholly without a remedy. As Lord Hardwicke put it, to "determine that frauds of this kind are out of the reach of courts of law or equity" would lead to "an intolerable grievance" (*Charitable Corp. v Sutton*, 2 Atk at 406).

To hold that there is no remedy when corporate fiduciaries use corporate assets to enrich themselves was unacceptable in 1742 and in 1832, and it is still unacceptable today. Derivative suits are not the only possible remedy, but they are the one that has been recognized for most of two centuries, and to abolish them in the LLC context would be a radical step.

Some of the problems such an abolition would create may be seen in the development of New York law since the Limited Liability Company Law, omitting all reference to derivative suits, was passed in 1994. Several courts have held that there is no derivative remedy for LLC members (*see Hoffman v Unterberg*, 9 AD3d 386 [2d Dept 2004]; *Lio v Mingyi Zhong*, 10 Misc 3d 1068[A], 2006 NY Slip Op 50016[U] [Sup Ct, NY County 2006]; *Schindler v Niche Media Holdings*, 1 Misc 3d 713, 716 [Sup Ct, NY County 2003]). But since the Legislature obviously did not intend to give corporate fiduciaries a license to steal, a substitute remedy must be devised. Perhaps responding to this need, some courts have held that members of an LLC have their own, direct claims against fiduciaries for conduct that injured the LLC—blurring, if not erasing, the traditional line between direct and derivative claims (*see Matter of Marciano [Champion Motor Group, Inc.]*, 2007 NY Slip Op 34071[U], *4 [Sup Ct, Nassau County 2007]; *Out of the Box Promotions LLC v Koschitzki*, 15 Misc 3d 1134[A], 2007 NY Slip Op 50973[U], *7 [Sup Ct, Kings County 2007]; *Lio*, 2006 NY Slip Op 50016[U], at *4). Similarly, Supreme Court's decision in this case upheld several of plaintiffs' claims that are not in issue here, characterizing

the claims as direct, though they might well be derivative under traditional analysis (*see generally*, Kleinberger, *Direct Versus Derivative and The Law of Limited Liability Companies*, 58 Baylor L Rev 63 [2006]).

Substituting direct remedies of LLC members for the old-fashioned derivative suit—a substitution not suggested by anything in the language of the Limited Liability Company Law—raises unanswered questions. Suppose, for example, a corporate fiduciary steals a hundred dollars from the treasury of an LLC. Unquestionably he or she is liable to the LLC for a hundred dollars, a liability which could be enforced in a suit by the LLC itself. Is the same fiduciary also liable to each injured LLC member in a direct suit for the member's share of the same money? What, if anything, is to be done to prevent double liability? No doubt, if the Legislature had indeed abolished the derivative suit as far as LLCs are concerned, we could and would answer these questions and others like them. But we will not readily conclude that the Legislature intended to set us on this uncharted path.

## II

As shown above, courts have repeatedly recognized derivative suits in the absence of express statutory authorization (*Robinson v Smith*, 3 Paige Ch 222 [1832]; *Klebanow v New York Produce Exch.*, 344 F2d 294 [2d Cir 1965]; *Riviera Congress Assoc. v Yassky*, 18 NY2d 540 [1966]). In light of this, it could hardly be argued that the mere absence of authorizing language in the Limited Liability Company Law bars the courts from entertaining derivative suits by LLC members. It is argued, however, by appellants and by our dissenting colleagues, that here we face not just legislative silence, but a considered legislative decision not to permit the remedy. The dissent finds, in the legislative history of the Limited Liability Company Law, a "legislative bargain" to the effect that derivative suits on behalf of LLCs should not exist (dissenting op at 113). We find no such thing. For us, the most salient feature of the legislative history is that no one, in or out of the Legislature, ever expressed a wish to *eliminate*, rather than limit or reform, derivative suits.

The Legislature clearly did decide not to enact a statute governing derivative suits on behalf of LLCs. An Assembly-passed version of the bill that became the Limited Liability Company Law included an article IX, entitled "Derivative Actions." In the Senate-passed version, and the version finally

adopted, the article was deleted, leaving a conspicuous gap; in the law as enacted, the article following article VIII is article X. Nothing in the legislative history discusses the omission. Our only source of information on the reason for it is a sentence written by the author of the Practice Commentaries on the Limited Liability Company Law: "Because some legislators had raised questions about the derivative rights provisions, to avoid jeopardizing passage of the balance of the entire law, Article IX was dropped" (Rich, Practice Commentaries, McKinney's Cons Laws of NY, Book 32/32A, Limited Liability Company Law, at 181 [2007]). Nothing tells us what the "questions" were, or why they would have jeopardized the bill's passage.

The dissent attempts to fill this gap by reviewing some other events preceding the passage of the legislation. The dissent points out that New York politicians in 1993 and 1994 wanted to improve "New York's overall business climate" (dissenting op at 110), and that among the proposed means of doing so were "bills . . . to *modify the treatment of* derivative lawsuits and authorize limited liability companies" (*id.*, quoting Blackman, Corporate Update, *Move Over Delaware! Making New York Incorporation-Friendly*, NYLJ, Dec. 16, 1993, at 5, col 2 [emphasis added]). But the dissent cites no evidence, and we know of none, that anyone ever suggested doing away with derivative suits entirely—a radical step, as we have already pointed out, and one that might be expected to harm the "business climate" more than help it.

In fact, the reforms of derivative suits that were under discussion in 1993-1994 came nowhere near to abolition. They were, in substance, proposals to codify and expand on our decision in *Auerbach v Bennett* (47 NY2d 619 [1979]), holding that a decision by disinterested directors to terminate a derivative suit would be honored by the courts (*see* Blackman, NYLJ, Dec. 16, 1993, at 5, col 2). All three of the bills introduced to reform derivative suits began with an endorsement of such suits in principle:

> "The legislature finds and declares it to be the public policy of the state of New York to maintain the shareholder derivative suit proceeding as a remedy for shareholders on behalf of New York corporations because such suits, when meritorious, serve as an important deterrent against breaches of fiduciary duties by directors of such corporations." (*See* NY

Senate Bill S6222 [introduced Dec. 15, 1993]; NY
Senate Bill S6222-A [amended Dec. 17, 1993]; NY
Assembly Bill A8938 [Dec. 17, 1993]).

The connection, if any, between the proposed reforms of de-
rivative suits and the fate of proposed article IX of the Limited
Liability Company Law is obscure. It seems to be true that the
Senate favored a bill from which article IX was absent, and that
the Assembly acquiesced in the Senate's preference. But this
does not prove that any legislator, much less the Legislature as
a whole, thought that the absence of article IX would render de-
rivative suits nonexistent—an extreme result that no legislator
is known to have favored. We simply do not know what conse-
quences the legislators expected to follow from the omission. It
is possible that some legislators did expect—though no one
expressed the expectation—that there would be no derivative
suits. It is possible that some legislators expected the courts to
follow the established case law, and to recognize derivative suits
in the absence of a "clear mandate against" doing so (*Klebanow*,
344 F2d at 298); one witness at a legislative public hearing did
express that expectation (statement of Howard N. Lefkowitz,
chair of Committee on Corporation Law, Association of Bar of
City of NY, Transcript of Assembly Public Hearing on Limited
Liability Company Legislation, June 11, 1992, at 133). It is pos-
sible that the Senate expected one thing, and the Assembly the
other. It is even possible that neither expected anything, except
that the problem would cease to be the Legislature's and become
the courts'. The legislative history is, in short, far too ambigu-
ous to permit us to infer that the Legislature intended wholly to
eliminate, in the LLC context, a basic, centuries-old protection
for shareholders, leaving the courts to devise some new
substitute remedy.

The dissent says that, in upholding the right of LLC members
to sue derivatively, we leave that right "unfettered by the
prudential safeguards against abuse that the Legislature has
adopted . . . in other contexts" (dissenting op at 121). But the
right to sue derivatively has never been "unfettered," and the
limitations on it are not all of legislative origin. The case in
which derivative suits originated, *Robinson v Smith*, held that
such a suit could be brought only on "a sufficient excuse"—i.e.,
a showing that those in control of the corporation "refused to
prosecute" because they were themselves the wrongdoers, or
were in "collusion with" them (3 Paige Ch at 232, 233). Later
cases reaffirmed the rule that a derivative action could not be

brought "unless it is necessary because of the neglect and refusal of the corporate body to act" (*see e.g. Continental Sec. Co. v Belmont*, 206 NY 7, 15 [1912]). The statutes governing ordinary business corporations and limited partnerships now reflect the existence of that rule, requiring the complaint in a derivative suit to allege "the efforts of the plaintiff to secure the initiation of such action . . . or the reasons for not making such effort" (Business Corporation Law § 626 [c]; Partnership Law § 115-a [3]). Other statutory provisions impose other limitations (*see* Business Corporation Law § 626 [b]; Partnership Law § 115-a [2] [contemporaneous ownership of plaintiff's interest]; Business Corporation Law § 627; Partnership Law § 115-b [posting security for expenses]). What limitations on the right of LLC members to sue derivatively may exist is a question not before us today. We do not, however, hold or suggest that there are none.

Finding no clear legislative mandate to the contrary, we follow *Robinson*, *Klebanow* and *Riviera* in concluding that derivative suits should be recognized even though no statute provides for them. We therefore hold that members of LLCs may sue derivatively (*accord Bischoff v Boar's Head Provisions Co. Inc.*, 436 F Supp 2d 626 [SD NY 2006]; *Weber v King*, 110 F Supp 2d 124 [ED NY 2000]; *contra Pennacchio ex rel. Old World Brewing Co., Inc. v Powers*, 2007 WL 446355, 2007 US Dist LEXIS 8051 [ED NY 2007]).

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed with costs and the certified question answered in the affirmative.

READ, J. (dissenting). The result in this case is unique in the annals of the Court of Appeals. Never before has a majority of the Court read into a statute provisions or policy choices that the enacting Legislature unquestionably considered and rejected. I respectfully dissent.

## Background and Legislative History

The limited liability company (LLC) first appeared in Wyoming in 1977, followed by Florida, which adopted an LLC act similar to Wyoming's in 1982. "As in Wyoming, the Florida statute was enacted to lure capital into the state," but "[a]s a result of the lingering uncertainty as to both tax treatment and the protection of the entity's members from personal liability," other states did not immediately follow suit (Keatinge et al.,

*The Limited Liability Company: A Study of the Emerging Entity*, 47 Bus Law 375, 383-384 [1992]). After the Internal Revenue Service's public ruling in 1988 that it would treat a Wyoming LLC as a partnership for tax purposes, however, many states and drafting commissions began to consider, or experiment with, LLC laws (*id.* at 384).

While all of this was happening, New York's Business Corporation Law was increasingly viewed as unfriendly to fledgling businesses. Indeed, in late 1993 a corporate lawyer in a major New York City law firm suggested that "[t]here are many cases where a lawyer who uses New York as the state of incorporation without discussing it in advance with his client is probably guilty of malpractice because of the many disadvantageous aspects of the New York law" (Peter Blackman, Corporate Update, *Move over Delaware! Making New York Incorporation-Friendly*, NYLJ, Dec. 16, 1993, at 5, col 2 [statement of Richard R. Howe]).

By the early 1990s, New York legislators and Governor Cuomo had advanced improving New York's overall business climate to the forefront of the political agenda in Albany (*see id.* ["In an effort to make New York a more attractive state in which to incorporate, several legislators have moved to even the imbalance between (New York and Delaware)"]). Although this pro-business agenda manifested itself in various ways—for example, it was in 1994 that Governor Cuomo and Chief Judge Kaye first sought to establish the Commercial Division of the Supreme Court (*see* Gary Spencer, *Cuomo Seeks State Commercial Court, Other Bills Aimed at Improvement of Business Climate*, NYLJ, Jan. 6, 1994, at 1, col 3)—two of the highest-profile pro-business initiatives were "bills pending in Albany to modify the treatment of derivative lawsuits and to authorize limited liability companies" (Blackman, NYLJ, Dec. 16, 1993, at 5, col 2). They were often cited together in reports of the legislative and gubernatorial agenda in 1993 and 1994 (*see id.*; *see also* Spencer, NYLJ, Jan. 6, 1994, at 1, col 3 ["pro-business proposals include bills that would: (d)iscourage shareholder derivative lawsuits . . . and (a)llow the formation of limited liability companies"]; Dao, New York Times, June 30, 1994, at B7 ["'(Governor Cuomo) has lobbied for legislation to limit a type of lawsuit, known as derivatives, brought by shareholders against corporate boards for wrongdoing. . . . He has advocated creating a hybrid business entity—a limited liability company—that would possess the liability protections of corporations but have the lower tax rates of partnerships"]).

By mid-1992, "18 states . . . permit[ted] the formation of LLCs[,] . . . two states [recognized] LLCs formed in other states[,] LLC statutes [we]re pending or [we]re being considered in approximately 28 other states, and the National Conference of Commissioners on Uniform State Laws [wa]s drafting a uniform LLC statute" (Brian L. Schorr, *Limited Liability Companies: Features and Uses*, 62 CPA J [Issue 12] 26 [Dec. 1992], reprinted in 805 PLI/Corp 191, 193). On March 19, 1992, a Joint Drafting Committee of the Association of the Bar of the City of New York and the New York State Bar Association submitted a proposed limited liability company act for the New York Legislature's consideration; by early May 1992, LLC bills had been introduced in both houses of the New York State Legislature (New York Limited Liability Company Law Update, 805 PLI/Corp at 211-212).

A limited liability company bill was introduced in the New York State Assembly as A11016 on March 31, 1992, less than two weeks after receipt of the Joint Drafting Committee's draft. A11016 was, for purposes of this case, substantially identical to the finally enacted Limited Liability Company Law with two related exceptions: article IX of the bill authorized members to bring derivative actions;[1] and section 610, which set out the general rule that a member may not initiate an action by or against the company, included a derivative suit under article IX

---

1. Article IX, as proposed in A11016 and the LLC bills introduced in the Assembly in 1993 (discussed infra at 113), authorized a member of an LLC to bring a derivative action; required at least one plaintiff to be a member at the time the action was commenced and at the time of the challenged transaction; required the complaint to set forth with particularity the plaintiff's or plaintiffs' efforts to secure the initiation of the action by the LLC's managers or those members who would otherwise have the authority to cause the LLC to sue in its own right; required court approval for the discontinuance, compromise or settlement of an action, and vested the court with discretion to require prior notice thereof by publication or otherwise to potentially affected members, and to assess the costs of this notice on one or more of the parties to the action; vested the court with discretion to award reasonable expenses, including reasonable attorneys' fees, to a successful plaintiff or plaintiffs; gave the LLC the right to security for expenses, including attorneys' fees, incurred in connection with the action unless the plaintiff's or plaintiffs' contributions or allocations amounted to 5% or more of the contributions or allocations of all members, or had a fair market value in excess of $50,000; and vested the court with discretion to determine the amount of any security even where the 5% or $50,000 test had been met, based upon the LLC's showing of need. These provisions were substantially the same as sections 115-a and 115-b of the Partnership Law, which were, in turn, patterned after sections 626 and 627 of the Business Corporation Law respectively.

as an exception to this rule.[2] A11016 was referred to committee after its introduction; the Assembly took no further action on this bill in 1992.

On May 12, 1992, a limited liability company bill was introduced in the New York State Senate as S8180. This bill was substantially identical to the Assembly bill except for the notable absence of any language authorizing derivative actions. S8180 was amended and reprinted three times between May 12 and June 25 of 1992, at which point S8180-C—which still did not contain any provisions relating to derivative actions—was referred to committee and left for a subsequent session.

On June 11, 1992, public hearings were held on the Assembly bill. Testifying at these hearings on behalf of the Bar Association of the City of New York and the Joint Drafting Committee were Brian Schorr[3] and Howard Lefkowitz. At the Assembly hearings, Mr. Schorr observed that "[t]he Assembly bill does contain provisions concerning the right of a member to bring a derivative action. These provisions are adapted from the [Partnership Law] . . . [T]he Senate bill contains no comparable provisions" (testimony of Brian L. Schorr, Transcript of Assembly Public Hearing on Limited Liability Company Legislation, June 11, 1992, at 27). At those same hearings, Mr. Lefkowitz, who was the chair of City Bar's Committee on Corporation Law, spoke extensively in favor of derivative actions on behalf of LLCs. Before the Senate, however, the only reference to derivative rights in any testimony was the following statement by Mr. Schorr:

---

2. Section 610, as proposed in A11016 and LLC bills introduced in the Assembly in 1993 (discussed infra at 113), read as follows:

> "A member of a limited liability company is not a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's right against or liability to the limited liability company *and except in cases provided for in section nine hundred one of this chapter*" (emphasis added).

This provision mimics section 115 of the Partnership Law. Notably, the Legislature amended section 115 in 1968 to add the language excepting "cases provided for in section [115-a]" when it added the latter provision, which authorizes and regulates derivative suits commenced by limited partners (*see* L 1968, ch 496, § 2).

3. Mr. Schorr, then a partner at a major New York City law firm, was co-chair of the Joint Drafting Committee. Another participant in the drafting of the proposed Limited Liability Company Law was Bruce A. Rich, author of the oft-cited McKinney's Practice Commentaries (*see* McKinney's Cons Laws of NY, Book 32/32A, Limited Liability Company Law, Preface, at III [2007 ed]; *see* infra at 114).

"The Senate bills are based in large part on the proposed limited liability company law prepared by the Joint Drafting Committee, with changes that have been agreed to with other proponents of a limited liability company law. Subject to two exceptions, [City Bar] enthusiastically supports the Senate bills . . . The two exceptions are the inclusion of a publication requirement and the lack of derivative action provisions" (testimony of Brian L. Schorr, Senate Public Hearing on Limited Liability Company Legislation, Dec. 4, 1992, at 2).

As the subsequent legislative history of the Limited Liability Company Law confirms, the omission of provisions authorizing derivative actions was a material—if not *the* material—term in the legislative bargain struck by the Senate and the Assembly.

As noted earlier, LLC bills were introduced, in substantially complete form, in both chambers of the Legislature in the spring of 1992. The Assembly bill (A11016) authorized derivative actions; the Senate bill (S8180) did not. After both chambers failed to pass an LLC bill in 1992, efforts to negotiate a mutually agreeable statute resumed in 1993. On January 6, 1993, an LLC bill, S27, was introduced in the Senate; neither S27 nor any of its three reprints in 1993 contained any provision authorizing derivative actions. On March 30, 1993, an LLC bill containing article IX and the accompanying language in section 610 was again introduced in the Assembly as A7127. This bill was referred to committee, and no further action was ever taken on it. On June 25, 1993, the Assembly Rules Committee introduced A8676, another LLC bill containing these same provisions authorizing derivative actions. On July 7, 1993, the Assembly passed the "B" print of this bill—which still allowed for derivative actions—and delivered it to the Senate. The Senate, which had never introduced any LLC bill sanctioning derivative actions, did not act on A8676-B, thus delaying the passage of any LLC law until at least 1994.

On March 8, 1994, S27 was reintroduced. On April 5, 1994, the Assembly Rules Committee introduced A11317, a companion to S7511, which was introduced in the Senate the same day. Unlike all prior Assembly bills, A11317 did *not* authorize derivative actions; as was the case with every prior Senate bill, S7511 likewise did not authorize derivative actions. On June 30, 1994, S7511 passed the Senate and was delivered to the Assembly. That same day, the Assembly substituted S7511 for A11317, and

on July 1, 1994, the Assembly passed S7511 and returned it to the Senate. The adopted bill was delivered to the Governor on July 15, 1994, and was signed into law on July 26, 1994, as chapter 576 of the Laws of 1994.

The deletion from the adopted LLC legislation of provisions authorizing derivative actions manifests a legislative bargain: the Senate refused to pass an LLC statute if it allowed for derivative suits. Nearly finalized LLC bills appeared in the Legislature as early as spring of 1992, and the Assembly actually passed a bill in mid-1993. Yet the Senate was unbending: at a time when serious consideration was being given to legislation cutting back on the derivative actions authorized by existing laws, the Senate refused to endorse any legislation allowing members of this new form of business entity, the LLC, to sue derivatively. It is this compromise—excision of provisions authorizing derivative actions from the Assembly bill in exchange for the Senate's agreement to the balance of the law—to which Mr. Rich, a participant in the drafting of the proposed Limited Liability Company Law, no doubt refers when he states that "[t]he absence of an Article IX from the LLCL was a conscious omission, not a typographical error, as the decision to omit derivative rights occurred late in the legislative session" (Practice Commentaries, McKinney's Cons Laws of NY, Book 32/32A, Limited Liability Company Law, at 181 [2007 ed]). The rejection of language authorizing derivative actions "strongly militates against a judgment that [the Legislature] intended a result that it expressly declined to enact" (*Gulf Oil Corp. v Copp Paving Co.*, 419 US 186, 200 [1974] [conference committee deleting House language]; *see also Pacific Gas & Elec. Co. v State Energy Resources Conservation & Development Comm'n*, 461 US 190, 220 [1983] [House bill deleting Senate language]; Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U Chi L Rev 800, 820 [1983] ["(W)here the lines of (legislative) compromise are discernible, the judge's duty is to follow them, to implement not the purposes of one group of legislators, but the compromise itself"]).[4]

The majority contends, however, that the Legislature's deletion of language authorizing derivative actions does not neces-

---

4. In 1999, the Limited Liability Company Law was amended to update various provisions. The original Senate bill included article IX (member's derivative actions), but was revised in committee to remove these provisions (compare 1997 NY Senate Bill S7331 with 1997 NY Senate Bill S7331-A, which is, as relevant here, identical to 1999 NY Senate-Assembly Bill S1640A, A2844A, enacted as chapter 420 of the Laws of 1999).

sarily bespeak compromise, and is, in any event, essentially unimportant because the language was superfluous. This is so because derivative rights are so well-entrenched in existing law that the Legislature might have reasonably expected the courts to do what the majority has now done: extend the right to commence a derivative action to an LLC member based on analogy to either a cestui que trust or a shareholder, both of whom historically enjoyed standing to sue derivatively, as a matter of equity in the former case and common law in the latter. To support this proposition, the majority relies on the Second Circuit's decision in *Klebanow v New York Produce Exch.* (344 F2d 294 [2d Cir 1965, Friendly, J.]) (*see* majority op at 104-105, 106), and an oblique reference to *Klebanow* and *Riviera Congress Assoc. v Yassky* (18 NY2d 540 [1966]) (without referring to either case by name) made by Mr. Lefkowitz in his testimony at Assembly (not Senate) hearings in 1992 (*see* majority op at 108).

In *Klebanow*, the United States Court of Appeals for the Second Circuit held that, even in the absence of statutory authorization, a limited partner in a dissolved firm had capacity to sue on behalf of the partnership (i.e., derivatively) for injury arising out of conduct proscribed by the antitrust laws where the partnership and the liquidating partner had disabled themselves or had a conflict of interest, rendering futile any demand for the partnership to sue. The court reasoned that this was so because a limited partner was more like a shareholder (especially a preferred holder), or perhaps a cestui que trust, than a creditor.[5]

But this case is not *Klebanow*. First, as Judge Friendly acknowledged, there was no suggestion "that the framers of the Uniform Limited Partnership Act or the legislature of 1922 had focused on the problem . . . at issue" (344 F2d at 298); i.e., whether to authorize limited partners to bring derivative suits. In this case, we know that the Legislature did indeed "focus[ ] on the problem . . . at issue"—whether to authorize members of LLCs to bring derivative suits—and decided not to do it. Second, section 118 of the Partnership Law, captioned "Rules for cases not covered," specifies that "[i]n any case not provided for in this article the rules of law and equity, *including the law*

---

**5.** The District Court Judge had dismissed the complaint principally on the ground that a limited partner was a creditor rather than an owner, and that the antitrust laws do not allow a creditor to bring a treble damages suit against third parties who have allegedly injured the firm (*see* 232 F Supp 965 [SD NY 1964]).

*merchant*, shall govern" (emphasis added). This provision lends support for the view implicitly taken by the courts in *Klebanow* and *Riviera* that the Legislature intended judges to interpret the Partnership Law with the freedom with which they would construe and apply principles of the common law or equity to fill in perceived legislative blanks, and—without doubt—at common law a shareholder could maintain a derivative suit, which is a remedial invention of equity.[6] There is no provision comparable to section 118 in the Limited Liability Company Law. Although one federal judge has expressed the view that "[h]ad the legislature intended to preclude derivative claims by LLC

---

**6.** Even so, *Klebanow* was a controversial decision. A majority of a distinguished panel of the First Department flatly rejected its holding in *Millard v Newmark & Co.* (24 AD2d 333 [1st Dept 1966]). *Millard* was authored by Justice Harold Stevens, who was subsequently an Associate Judge on this Court as well as Presiding Justice of the First Department. He was joined in the three-judge majority by Justice Charles Breitel, subsequently the Chief Judge of this Court. In *Millard,* the Court held that because limited partnerships "are solely creatures of statute," limited partners "have only such rights, duties, obligations, etc., as the statute may provide" (*id.* at 335), and therefore no derivative action should be implied where the Legislature failed to create one. Further, the Court observed that the Second Circuit in *Klebanow* "seem[ed] to have gone on the basis of policy considerations and to have overlooked the fact that the New York Legislature has not so extended the law as to limited partnerships" (*id.* at 339-340). In his writing for the two-judge partial dissent, Justice Benjamin Rabin generally subscribed to the Second Circuit's reasoning in *Klebanow*, stating at the outset that he "dissent[ed] because [he] believe[d] that unless such right be given there will be a failure of an adequate remedy for the wrongs alleged to have been done" (*id.* at 340). In light of the unsettled nature of the law in the wake of *Klebanow* and *Millard,* the Law Revision Commission undertook a study "examin[ing] the power of a limited or special partner to commence a derivative action in the right of the limited partnership, . . . [a] problem [that presumptively] arises because the general partners are unable, or wrongfully have refused, to maintain the action on behalf of the firm" (Act, Recommendation and Study relating to Derivative Actions by Limited Partners, 1967 NY Legis Doc No. 65[B], at 13). The study, which recommended legislation to authorize derivative actions by limited partners, was completed (but not issued) before we handed down our decision in *Riviera,* which held that limited partners are analogous to cestuis que trustent, and are "authorized to sue as limited partners on behalf of the partnership entity to enforce a partnership claim when those in control of the business wrongfully decline to do so" (18 NY2d at 547). Although *Riviera* resolved the conflict prompting its study and recommendations, the Commission nonetheless took the position that legislation remained "appropriate . . . to clarify and regulate the right and obligations resulting from the [*Riviera*] decision . . . rather than to allow rules to be formulated on a case-by-case basis" (1967 NY Legis Doc No. 65[B], at 9). The Legislature adopted the Commission's proposed bill in 1968 (*see* L 1968, ch 496, amending Partnership Law § 115 and adding Partnership Law §§ 115-a, 115-b, 115-c).

members, it easily could have written an explicit prohibition into the law" (*Bischoff v Boar's Head Provisions Co., Inc.*, 436 F Supp 2d 626, 632 [SD NY 2006]), the Legislature does not customarily write zipper clauses into its statutes, or explicitly prohibit the courts from implying rights or liabilities that it did not choose to include. Rather, the modern Legislature reasonably expects the judiciary to respect its policy choices (*see e.g. Sherman v Robinson*, 80 NY2d 483, 489 [1992] [where the legal duty owed to a third party by a store selling alcoholic beverages is limited by General Obligations Law § 11-101 and does not include a duty to investigate possible indirect sales, "(g)iven the Legislature's choice not to provide liability for (indirect sales), we decline to expand the common law to impose such liability"]).

Next, Mr. Lefkowitz, who testified in favor of the right of LLC members to bring derivative suits, observed that "[s]tate and federal courts in New York have permitted derivative actions by a limited partner on behalf of limited partnerships without express statutory authority" and opined that

> "*if and to the extent that* members of a limited liability company are analogous to a minority shareholder or a limited partner . . . such member would, as a matter of common law precedent, have the right to bring a derivative action on behalf of a limited liability company whether or not the statute contains such an express right" (testimony of Howard Lefkowitz, Assembly Transcript, June 11, 1992, at 132, 133 [emphasis added]).

This testimony has been cited to support the proposition that the absence of an explicit provision in the Limited Liability Company Law authorizing derivative actions does not matter because the Legislature was aware that, under settled law, these provisions were unnecessary (*see Bischoff*, 436 F Supp 2d at 632-633; majority op at 108).

Courts have on occasion taken the position that "disappearance" of a provision from a statute "during the legislative travel" may not be significant "when settled law indicates that the omitted provision would have been surplusage" (*Diamond Crystal Salt Co. v P.J. Ritter Co.*, 419 F2d 147, 148 [1st Cir 1969] [in light of "the overwhelming weight of judicial authority favor(ing) retrospective construction," the Massachusetts long-arm statute applied retroactively notwithstanding that, in the year the law was enacted, four bills were filed, two of which expressly provided for retroactivity, and the Legislature enacted

a bill omitting this language]). But here, there is no settled law in New York, or elsewhere for that matter, respecting LLCs and derivative suits (*see* Walker, New York Limited Liability Companies and Partnerships: A Guide to Law and Practice § 3:22, at 67 [1 West's NY Prac Series 2002] [while "(t)here is well-established case law for the treatment of C corporations, S corporations, limited partnerships and general partnerships" on many questions, "(n)o such extensive body of law yet exists for LLCs, although all of the states and the District of Columbia have enacted LLC statutes"]).

This vacuum no doubt exists because LLCs are a fairly recent statutory innovation, unknown to the common law; a new business form combining corporate-type limited liability with partnership tax advantages and organizational characteristics. On the matter of derivative suits in particular, there are divergent views throughout the country. The Uniform Limited Liability Company Act developed by the National Conference of Commissioners on Uniform State Laws provides for derivative suits modeled on the provisions of the Revised Uniform Limited Partnership Act. Many states have adopted laws along similar lines. By contrast, other states, preferring the American Bar Association's (ABA) Prototype Limited Liability Company Act, require disinterested members or managers to authorize litigation. The co-author of the major treatise on limited liability companies—who (unlike the majority) questions the utility of derivative suits in the LLC context—advocates the ABA's approach as "a reasonable compromise" (*see* Ribstein, *The Emergence of the Limited Liability Company*, 51 Bus Law 1, 23 [1995-1996] ["If the (derivative suit) remedy is justified . . . , it is only because requiring plaintiffs to seek authorization from the thousands of shareholders of publicly held firms could prevent some legitimate suits," but "(t)he same point does not apply . . . to closely held firms. Moreover, LLC members generally have other means of self-protection at their disposal that corporate shareholders may lack, including a default right to sell their interests back to the firm and substantial veto and removal powers"]).

In short, there is no settled law in New York or elsewhere on the subject of derivative rights for LLC members. Certainly, a third-party advocate's prediction that the courts might ignore the Legislature's policy choice (which, after years of contrary Supreme Court and Appellate Division holdings, is today made prescient) does not express or create settled law. Essentially, the

majority simply disagrees with the Legislature, calling a deci-
sion not to authorize derivative suits in the context of LLCs a
"radical step . . . that might be expected to harm the 'business
climate' more than help it" (majority op at 107). But whether
or not to vest LLC members with the right to sue derivatively is
the Legislature's choice to make, not ours. Moreover, although
the majority argues that *failing* to recognize a derivative right
under the statute is an "extreme result" (*id.* at 108), creating
an "uncharted path" upon which "we will not readily conclude
that the Legislature intended to set us" (*id.* at 106), the
"uncharted path" is the one taken by the majority: judicially
legislating a cause of action that was rejected by the Legislature,
and, for more than a decade after the Limited Liability Company
Law's enactment, was not recognized by any New York court.

## Our Precedents

The majority does not cite a single case where we have read
into a statute a provision or policy choice that we know the
enacting Legislature rejected. Indeed, we have never done such
a thing before. We have, in fact, consistently deferred to the
Legislature in cases where the facts are far less compelling than
they are here. For example, in *Majewski v Broadalbin-Perth
Cent. School Dist.* (91 NY2d 577, 581 [1998]), we were asked
"whether certain amendments to the Workers' Compensation
Law should be construed as retroactively applicable to pending
actions." We noted "[i]mportantly," that the statute's initial
draft included language providing for retroactive application,
which "[did] not appear in the enacted version. A court may ex-
amine changes made in proposed legislation to determine
intent" (*id.* at 587). Further, we quoted *People v Korkala* (99
AD2d 161, 166 [1st Dept 1984]) to the effect that "rejection of a
specific statutory provision is a significant consideration when
divining legislative intent" (*Majewski*, 91 NY2d at 587). Noting
that the deletion of the provision was consistent with settled
law presumptively favoring prospective application, we held
that the statute "should be applied prospectively to actions filed
postenactment" (*id.* at 581).

In *Matter of Grand Jury Subpoena Duces Tecum Served on
Museum of Modern Art* (93 NY2d 729, 732 [1999]), we were
called upon to decide "whether Arts and Cultural Affairs Law
§ 12.03, which protects the artwork of nonresident lenders from
any kind of seizure while on exhibit in New York State, encom-
passes a subpoena duces tecum requiring production of two

paintings . . . on loan to the Museum of Modern Art in New York" from a museum in Vienna (internal quotation marks omitted). The statute's predecessor's Bill Jacket included a letter from a City Bar committee questioning whether the legislation, as drafted, might prevent a rightful owner from recovering stolen art, and proposing a distinction to prevent this from happening. The Bill Jacket also, however, included a memorandum from the Attorney General, cautioning against creating any such "loopholes" in the statute, which "would force potential good-faith lenders to seek legal advice before lending artwork to museums, thus defeating the bill's purpose" (*id.* at 737). The Legislature did not adopt the change recommended by City Bar; as a result, the statute did not include any language embodying City's Bar's proposed exemption. Citing *Majewski*, we stated that

> "[i]t is well settled that legislative intent may be inferred from *the omission of proposed substantive changes in the final legislative enactment*. Thus, this history, coupled with the language of the statute, demonstrate a clear mandate from the Legislature. The statute's 'no loopholes' approach compels our holding that Arts and Cultural Affairs Law § 12.03 is not limited to civil process" (*id.* at 738 [citation omitted and emphasis added]).

In a related vein, just this past year in *People v Bratton* (8 NY3d 637 [2007]) we rejected a plea to read into article 12-B of the Executive Law an exception to the warrant requirement for violations taking place in a parole officer's presence. Acknowledging that this "would make sense" and that CPL 410.50 (4) authorizes a *probation* officer to take a probationer into custody without a warrant in such circumstances, we observed that "[t]he Legislature . . . did not include language comparable to CPL 410.50 (4) in the provisions of the Executive Law governing violation of parole. Nor can there be any doubt that this was a considered legislative choice" (*Bratton*, 8 NY3d at 641-642). For the latter proposition, we relied on legislative history showing that when the Legislature enacted article 12-B, it omitted the language found in predecessor statutes authorizing warrantless arrests for violations in a parole officer's presence. In short, we declined the invitation to read into a statute a provision that we knew the enacting Legislature chose not to include. We did not look to common law or to provisions in related statutes for license to second-guess the Legislature's policy choice.

## Conclusion

The enacting (not a subsequent) Legislature considered and explicitly rejected language authorizing the very result that plaintiffs have successfully sought from the judiciary in this case. Fourteen years after the fact the majority has unwound the legislative bargain. The proponents of derivative rights for LLC members—who were unable to muster a majority in the Senate—have now obtained from the courts what they were unable to achieve democratically. Thanks to judicial fiat, LLC members now enjoy the right to bring a derivative suit. And because created by the courts, this right is unfettered by the prudential safeguards against abuse that the Legislature has adopted when opting to authorize this remedy in other contexts (*see* Business Corporation Law §§ 626, 627; Partnership Law §§ 115-a, 115-b).

Presumably, those businesses electing to organize as LLCs relied on what the Limited Liability Company Law says, and counted on the New York judiciary to interpret the statute as written. Instead, the majority has effectively rewritten the law to add a right that the Legislature deliberately chose to omit. For a Court that prides itself on resisting any temptation to usurp legislative prerogative, the outcome of this appeal is curious. I respectfully dissent.

Chief Judge KAYE and Judges CIPARICK and PIGOTT concur with Judge SMITH; Judge READ dissents in a separate opinion in which Judges GRAFFEO and JONES concur.

Order, insofar as appealed from, affirmed, with costs, and certified question answered in the affirmative.