New York State Workers' Compensation Board, in its capacity as the governmental agency charged with administration of the Workers' Compensation Law and attendant regulations, and in its capacity as the successor in interest to THE HEALTHCARE INDUSTRY TRUST OF NEW YORK, and as assignee of certain claims of certain former members of THE HEALTHCARE INDUSTRY TRUST OF NEW YORK, Plaintiff,

against
Compensation Risk Managers, LLC et al., Defendants.


5966-09

Rupp Baase Pfalzgraf Cunningham LLC
Attorneys for the New York State Workers' Compensation Board
(Daniel E. Sarzynski, Matthew C. Lenahan and Anne K. Bowling, of counsel)
1600 Liberty Building
Buffalo, New York 14202
John H. Snyder, PLLC
Attorneys for Patrick Borek, Kathleen Collins, Joseph Creador, Donald Larder, Karen Pfeifer, Robert Schuck, David Smeltzer, Michael Sweeney, Louis Viteritti and Linda Walleshauser
(John H. Synder and Thomas C. Sima, of counsel)
555 Fifth Avenue, Suite 1700
New York, New York 10017
Vedder Price, P.C.
Attorneys for UHY LLP
(John H. Eickemeyer and Daniel C. Green, of counsel)
1633 Broadway, 47th Floor
New York, New York 10019


Richard M. Platkin, J.

This is an action originally commenced by former employer-members of the Healthcare Industry Trust of New York ("HITNY" or "Trust"), now being prosecuted by the New York State Workers' Compensation Board ("WCB" or "Board") as assignee. Defendants Patrick Borek, Kathleen Collins, Joseph Creador, Donald Larder, Karen Pfeifer, Robert Schuck, David Smeltzer, Michael Sweeney, Louis Viteritti and Linda Walleshauser, each of whom is alleged to have served as a HITNY trustee ("Trustee"), move pursuant to CPLR 3211 (a) (1), (3), (5) and (7) and CPLR 3016 (b) for dismissal of the complaint. The Trustees also move to disqualify the law firm of Rupp Baase Pfalzgraf Cunningham LLC from continuing to represent the Board in this action. Defendant UHY LLP ("UHY"), an accounting firm that served as an independent auditor of the Trust's financial statements, moves pursuant to CPLR 3211 (a) (1), (5) and (7) for dismissal of the complaint. The Board opposes the motions and cross-moves to consolidate this action with two other related cases.
BACKGROUND
A. HITNY
HITNY is a group self-insured trust ("GSIT") formed pursuant to the Workers' Compensation Law ("WCL") and attendant regulations. Trust members were employers within the healthcare industry that conducted business in New York State and were required to provide workers' compensation insurance to their employees.
The Trust was formed when defendant David Smeltzer, a senior executive with a healthcare employer, executed a trust agreement with Key Bank of New York on September 12, 1999. The trust agreement included joinder and indemnification provisions that were assented to by Smeltzer and a representative of Compensation Risk Managers, LLC ("CRM"). In connection with the formation of the Trust, HITNY entered into a separate service agreement, also signed by Smeltzer, by which CRM was engaged to serve as the Trust's group administrator. The WCB approved HITNY's application to operate as a GSIT effective December 1, 1999.
At various times, the Board found the Trust to be underfunded and requested the implementation of remedial measures. For example, the Board and the Trustees entered into several consent decrees, pursuant to which the Trustees agreed, among other things, to temporarily close the Trust to new members, eliminate and/or reduce discount rates, and levy assessments on Trust members.
The Board alleges that in the earlier years of the Trust's existence, the financial statements presented to it showed small but manageable deficits. Beginning in 2006, however, the financial statements disclosed far more serious problems. For the fiscal year ending on September 30, 2005, the Trust's audited financial statements showed a deficit of almost $6 million, a three-fold increase from the prior year. By September 30, 2006, this deficit had ballooned to more than $75 million.
On or about December 31, 2007, the Board assumed administration of the Trust after finding it to be insolvent and unable to properly administer outstanding liabilities (see 12 NYCRR 317.20). As such, the WCB is the successor to the Trust. 
After assuming administration, the WCB issued letters to Trust members advising them of their joint and several liability for the Trust's deficit, estimated to be about $90 million at that point, and the prospect of collection actions against employer-members who failed to pay their [*2]share.
The Board also commissioned a forensic analysis of the Trust by the public accounting firm of Bollam, Sheedy, Torani & Co., LLP ("BST"). In a report dated November 24, 2009, BST found that the Trust's accumulated deficit was in excess of $220 million as of late 2006. After receiving this report, the Board issued letters to the former Trust members advising them of their joint and several liability for the deficit.
On or about December 30, 2013, the Board purchased an assumption of liability ("ALP") policy for the Trust at a cost of $82.7 million, which served to transfer financial risk to the ALP carrier. The Board alleges that, despite its efforts to reduce the Trust's deficit, more than $20 million in unfunded liabilities remain.
B. Procedural Background
This action ("Member Action" or "HITNY Action") was commenced on July 10, 2009. It originally was brought by certain former employer-members of the Trust, seeking to recover the Trust's accumulated deficit from certain individuals and entities involved with the Trust, including CRM, alleged affiliates of CRM and other related entities ("CRM Entities"), certain individuals alleged to have been owners, officers and/or employees of CRM ("CRM Individuals"), and the Trustees. The public accounting firm of UHY, which provided independent audits of the Trust's financial statements, and the actuarial firm of SGRisk, LLC ("SGRisk"), which served as the Trust's actuary, also were named as defendants.
On December 9, 2009, the Board commenced an action in this Court in its governmental capacity and as the successor to eight GSITs administered by CRM, including HITNY (Index No. 10288-09 ["Board Action"]). The Board Action originally was brought against CRM, the CRM Entities and the CRM Individuals (collectively "CRM Defendants"), but the Trustees were joined via a second amended complaint filed on November 6, 2013.
On March 31, 2010, CRM applied for an order from the New York State Litigation Coordinating Panel ("LCP") coordinating certain pending actions pertaining to CRM's administration of GSITs, including this case. The LCP issued an Order to Show Cause on April 16, 2010 staying pretrial proceedings in all of the actions that were the subject of CRM's coordination application. The LCP ultimately granted the request for coordination on February 23, 2011, and the coordinated cases were transferred to the undersigned as Coordinating Justice. 
Shortly thereafter, certain of the CRM Entities filed for bankruptcy protection, and the Insurance Commissioner of the State of California placed Majestic Insurance ("Majestic") into a conservation proceeding in the California courts ("Conservation Proceeding"). The commencement of the Bankruptcy Proceeding and the Conservation Proceeding operated to stay the lawsuits against CRM and the CRM Entities until February 14, 2013. As part of the resolution of the bankruptcy case, the former employer-members of the Trust who commenced this action ("Members") agreed to dismiss their claims against CRM and the CRM Entities, and a notice of discontinuance was filed on April 12, 2013.
During the pendency of the bankruptcy and conservation stays, the Board commenced a new action in this Court against UHY and SGRisk (Index No. 4620-11 ["UHY Action"]). Defendants' pre-answer motions to dismiss were granted in part and denied in part by Decision & Order dated March 1, 2013, and those rulings were affirmed substantially on appeal (116 AD3d 1148 [3d Dept 2014]). The Board and SGRisk then entered into a settlement agreement, [*3]leaving UHY as the sole remaining defendant. Under the extant scheduling order, which was entered on the stipulation of all parties to the case, the Board was directed to file a trial-term note of issue by January 4, 2016.
After the various stays had been lifted, the Board and the Members entered into settlement negotiations and, on August 28, 2013, executed a Joint Stipulation whereby the employer-members "agree[d] and stipulate[d] that the [WCB] shall have the sole legal standing to pursue all claims on behalf of HITNY" in the Member Action, Board Action and UHY Action (collectively "CRM Actions"). The parties further agreed that the Members would retain their claims against the insurance brokers who placed them in the Trust, and those claims would be severed and made the subject of a separate action. A subsequent stipulation entered into by all parties to the cases subject to the LCP's order of coordination ("Coordinated Cases") authorized the substitution of the Board as the plaintiff in this action in its capacity as the assignee of the claims of the Members.
By Decision & Order dated February 11, 2016, the Board was granted leave to file and serve a fifth amended complaint ("Complaint"), and the new complaint was filed on or about September 7, 2016. The instant motion practice ensued.
C. The Complaint
1. The CRM Defendants
A considerable portion of the Complaint is directed at the alleged misconduct of the CRM Defendants, who are said to have "exercised complete dominion and control over the Trust and its operations and over the Trustees of the Trust" (¶ 147). The Complaint alleges, among other things, that the CRM Defendants: (a) induced employers to join and remain Trust members through false representations concerning the financial viability of GSIT membership, the associated risks, and CRM's competency and qualifications to administer to the Trust (¶¶ 205-211); (b) failed to administer the Trust in accordance with the WCL, attendant regulations, the trust and service agreements, the Trust's by-laws and common-law standards of care (¶¶ 212, 214-217); (c) concealed the Trust's true financial condition by routinely miscalculating the Trust's funding requirements and failing to maintain adequate Trust assets (¶¶ 233-238); (d) set inadequate contribution rates and provided excessive discounts in order to induce employers to join and remain members of the Trust and forestall corrective action (¶¶ 239-248); (e) engaged in self-dealing in relation to insurance coverage for the Trust (¶¶ 249-258); (f) provided inadequate claims administration services (¶¶ 259-268); and (g) failed to provide meaningful loss control services (¶¶ 269-271). These actions and omissions on the part of the CRM Defendants allegedly caused the Trust to become underfunded and/or insolvent (¶¶ 214-217).
2. The Trustees
With respect to the Trustees, the Complaint alleges that they failed to properly administer the Trust's business affairs and ensure that its service providers, including CRM and UHY, performed their responsibilities in a competent fashion (¶ 360). In particular, the Complaint alleges, among other things, that the Trustees: (a) failed to comply with the obligations imposed upon them by the WCL, attendant regulations, the terms of the trust agreement and service agreement, the Trust's by-laws, and common-law duties (¶¶ 361-364); (b) neglected to exercise sufficient oversight over CRM with respect to matters such as capitalization, contribution rates and discounting (¶¶ 365-368); (c) failed to observe Trust formalities (¶ 369); (d) did not take [*4]timely action to ensure the solvency of the Trust (¶ 371); (e) failed to properly inform Trust members of the true financial condition of the Trust (¶ 372); and (f) entered into improvident contracts that were detrimental to the Trust, including the service agreement with CRM (¶ 375). Five of the 18 causes of action alleged in the Complaint are directed at the Trustees: negligent misrepresentation (5th); breach of fiduciary duty (7th); negligence (8th); gross negligence (9th); and implied indemnity (18th).
3. UHY
The Complaint alleges that the Trust and/or CRM contracted with UHY to provide independent auditing services to the Trust. WCB regulations require GSITs to annually submit an audited financial statement prepared in accordance with generally-accepted accounting principles and certified by an independent certified public accountant (see 12 NYCRR 317.19). The most significant item on the Trusts' financial statements were estimates of future claims liabilities, also known as loss reserves. 
The Board alleges that "the financial statements of the Trust grossly understated the Trust's unpaid claims liabilities and expenses and contained other material misstatements" (¶ 324). According to the Board, UHY colluded with CRM and/or SGRisk "to make the Trust appear more economically attractive to existing and potential Trust members by purposely underestimating the claims liability of the Trust, thereby artificially lowering the premium amounts necessary to keep the Trust properly funded" (¶ 327). Thus, UHY is alleged to have "failed to perform or negligently performed its [auditing] duties . . . , including . . . the duty to discover the true financial condition of the Trust and, through its audit reports or otherwise, to advise the Trust's members . . . about that financial conditional and the remedial actions necessary to restore the Trust to financial soundness (¶ 323).
The Complaint alleges four causes of action against UHY: negligent misrepresentation (5th); breach of contract (10th); negligence (11th); and implied indemnity (17th).
LEGAL STANDARD
Dismissal under CPLR 3211 (a) (1) is warranted "if documentary evidence conclusively establishes a defense as a matter of law" (Haire v Bonelli, 57 AD3d 1354, 1356 [3d Dept 2008]; see Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 [2002]; Angelino v Michael Freedus, D.D.S., P.C., 69 AD3d 1203, 1205 [3d Dept 2010]). On such a motion, "affidavits submitted by a defendant do not constitute documentary evidence upon which a proponent of dismissal can rely" (Crepin v Fogarty, 59 AD3d 837, 838 [3d Dept 2009]).
On a motion to dismiss made pursuant to CPLR 3211 (a) (7), "the [C]ourt must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference" (EBC 1, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). The Court's "sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (Polonetsky v Better Homes Depot, Inc., 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]). However, the Court need not "accept as true legal conclusions or factual allegations that are either inherently incredible or flatly contradicted by documentary evidence" (1455 Washington Ave. Assoc. v Rose & Kiernan, 260 AD2d 770, 771 [3d Dept 1999] [internal quotation marks and citations omitted]).
Dismissal is warranted under CPLR 3211 (a) (5) where the movant establishes that a cause of action may not be maintained due to the expiration of the statute of limitations. The movant bears the initial burden of "support[ing] the motion with an affidavit or other competent proof sufficient, if uncontroverted, to establish the [statute of limitations] defense as a matter of law" (State Higher Educ. Services Corp. v Starr, 158 AD2d 771, 771 [3d Dept 1990]; see Romanelli v Disilvio, 76 AD3d 553, 554 [2d Dept 2010]). Upon such a showing, "the burden shifts to the party opposing the motion to aver evidentiary facts" sufficient to defeat the statute of limitations defense, or at least raise factual questions concerning the defense (Hoosac Val. Farmers Exch. v AG Assets, 168 AD2d 822, 823 [3d Dept 1990]; see Doyon v Bascom, 38 AD2d 645, 645-646 [3d Dept 1971]).
THE TRUSTEES' MOTION
A. Derivative Claims
As a threshold matter, the Trustees contend that the Members lack standing to sue on behalf of the Trust and, therefore, the derivative claims alleged by the Board as the assignee of such claims must be dismissed. According to the Trustees, members of a GSIT have no right to sue derivatively and, in any event, the commencement of the Board Action divested the Members of any standing they might have had to sue in a representative capacity on behalf of the Trust.
The parties have not cited any precedent that speaks directly to the issue of whether GSIT members have a right to sue derivatively on behalf of the trust for wrongs allegedly committed against the trust. However, New York law is well developed with respect to derivative suits brought on behalf of other types of business entities.
In the corporate context, it is black letter law that a shareholder has no individual cause of action for a wrong committed against the corporation (see Abrams v Donati, 66 NY2d 951, 953 [1985]). "The proper remedy in such a situation is a 'derivative action,' which is an action brought by a shareholder in the name or right of a corporation to redress an injury sustained by, or to enforce a duty owed to, the corporation" (13 Fletcher, Cyclopedia of Corporations § 5939 [2017]). "The derivative suit has been part of the general corporate law of [New York] since at least since 1832. It was not created by statute, but by case law . . . for shareholders to have recourse when those in control of a corporation betrayed their duty" (Tzolis v Wolff, 10 NY3d 100, 103 [2008], citing Robinson v Smith, 3 Paige Ch 222 [1832]). "Eventually, the rule that derivative suits could be brought on behalf of ordinary business corporations was codified by statute" (id. at 104, citing Business Corporation Law § 626 [a]).
In 1966, the Court of Appeals recognized the right of a limited partner to sue derivatively on behalf of a partnership, "relying, as had Chancellor Walworth [in Robinson v Smith] long before, on an analogy with the law of trusts" (id., citing Riviera Congress Assoc. v Yassky, 18 NY2d 540, 547 [1966]). And in Tzolis, the Court of Appeals ruled that a member of a limited liability corporation could sue derivatively, even where the State Legislature affirmatively "decide[d] not to enact a statute governing derivative suits" (id. at 105-107).
In light of this precedent, the Court is unpersuaded by the Trustees' reliance on the absence of a statute or regulation authorizing members of a GSIT to sue derivatively or the State Legislature's failure to authorize derivative suits in its myriad amendments to WCL § 50 in recent years. "As shown above, courts have repeatedly recognized derivative suits in the absence of express statutory authorization" (id. at 106 [citations omitted]). Moreover, the Court of Appeals' [*5]longstanding recognition of derivative suits is itself informed by "a familiar principle of the law of trusts: that a beneficiary (or 'cestui que trust') could bring suit on behalf of a trust when a faithless trustee refused to do so" (id. at 103 [emphasis added]). Further, the Trustees have failed to establish that the prosecution of derivative suits by GSIT members is fundamentally inconsistent with the regulatory structure established by the Legislature or unnecessary in light of the Board's authority over GSITs and those who participate in their administration.
Of course, "the right to sue derivatively has never been 'unfettered,' and the limitations on it are not all of legislative origin" (id. at 108). "The case in which derivative suits originated, Robinson v Smith, held that such a suit could be brought only on 'a sufficient excuse' — i.e., a showing that those in control of the corporation 'refused to prosecute' because they were themselves the wrongdoers, or were in 'collusion with' them" (id., quoting Robinson, 3 Paige Ch at 232-233). "Later cases reaffirmed the rule that a derivative action could not be brought unless it is necessary because of the neglect and refusal of the corporate body to act" (id. at 108-109 [internal quotation marks and citation omitted]). 
Thus, even assuming that Members had standing to commence this action on July 10, 2009 by dint of the pre-suit demand made upon the Board,[FN1]
the Court concludes that the Members were divested of standing to maintain a derivative action on December 9, 2009, when the Board commenced its own action in the name and stead of the Trust to vindicate the Trust's legal rights and remedies against the parties believed to be responsible for the Trust's deficit. Once the Board initiated litigation as the successor to the Trust (see 12 NYCRR 317.20), any need for the Members to act in a representative capacity had passed.
Indeed, the conclusion that the Board Action divested the Members of standing to maintain a derivative claim is consistent with the position consistently taken by the Board before this Court over the years. This is evidenced most starkly in the affirmation submitted by the WCB in seeking to join the Trustees as defendants in the Board Action. In response to the opposition filed by the Members, the WCB submitted the reply affidavit of Michael Papa, Esq., sworn to May 23, 2013, which states:
13. . . . [P]rior to the WCB commencing its action, the members would have had standing to commence [an action on behalf of HITNY]. This is because while member claims are derivative of HITNY itself, the WCB had not, as of then, commenced an action on behalf of the Trust.
14. However, once the WCB commenced an action on behalf of all HITNY members (not just certain members), all claims that could have been advanced by HITNY . . . are properly advanced solely by the WCB as successor in interest to HITNY. 15. The only claims which are not derivative to those of the WCB are claims against . . . individual insurance brokers who advised individual members to participate in HITNY.
16. . . . Having so acted [through the commencement of the Board Action], the WCB divested the members of HITNY, including [the Members], of standing to advance any claims . . . that could be advanced by HITNY itself. . . .
At oral argument on the pending motions and in a supplemental affirmation of counsel submitted following argument, the Board concedes that the Members were divested of standing as a result of the commencement of the Board Action, which is consistent with the position taken in the Papa Affidavit and in other representations made to the Court. However, the Board now maintains that standing was somehow "revived" in 2014 when the Members assigned their derivative claims to the Board. According to the Board, "when a plaintiff has a standing to bring a claim and subsequently a different party becomes the real party in interest with authority to prosecute the claims, the latter party can step into the shoes of the original plaintiff and continue the action without interruption (see WCB's Brief, p. 16).
The Court does not find the Board's "revival" theory to be persuasive here. "[A]s successor in interest to the assignor plaintiffs," the Board "may assert claims to the extent that these plaintiffs had standing to raise them" (Accredited Aides Plus, Inc. v Program Risk Mgt., Inc., 147 AD3d 122, 129 [3d Dept 2017]), but the Board can acquire no greater rights than those possessed by the Members at the time of the assignment (see Matter of International Ribbon Mills [Arjan Ribbons], 36 NY2d 121, 126 [1975] ["It is elementary ancient law that an assignee never stands in any better position than his (or her) assignor."]). Thus, even assuming that the right of the Members to prosecute a derivative action on behalf of the Trust survives assignment to the Trust (or its successor), the Members lacked standing to sue on behalf of the Trust at the time of the assignment and in the almost four and one-half years preceding the assignment. Inasmuch as a plaintiff prosecuting a derivative action must maintain standing at all times throughout the lawsuit (see e.g. Rubinstein v Catacosinos, 91 AD2d 445, 445 [1st Dept 1993], affd 60 NY2d 890 [1983]), the Members' lack of standing prior to assignment precludes the Board from maintaining this action as the assignee of the Members' derivative claims.[FN2]

The Trustees assert that three of the five claims alleged against them are derivative in nature — the causes of action for breach of fiduciary duty, negligence and gross negligence — and the Board concedes as much (see also Accredited Aides, 147 AD3d at 132-133). Accordingly, the claims for breach of fiduciary duty, negligence and gross negligence are dismissed against the Trustees for lack of standing.
B. Negligent Misrepresentation
The Trustees seek dismissal of the claim for negligent misrepresentation as barred by the expiration of the statute of limitations and for failure to plead with the particularity required by CPLR 3016 (b).
1. Statute of Limitations
A claim of negligent misrepresentation is subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period (see Colon v Banco Popular N. Am., 59 AD3d 300, 301 [1st Dept 2009]; cf. CIFG Assur. N. Am., Inc. v J.P. Morgan Sec. LLC, 146 AD3d 60, 67 [1st Dept 2016]). Where the misrepresentation claim sounds in actual fraud, plaintiffs also may avail themselves of the two-year discovery rule (see NYAHSA Servs., Inc., Self-Ins. Trust v People Care Inc., 141 AD3d 785, 791 [3d Dept 2016]). The claim accrues when the misrepresentation is made and relied on (see Gerschel v Christensen, 143 AD3d 555, 557 [1st Dept 2016]; Catanzano v Warren Rosen & Co., 19 AD3d 250, 250 [1st Dept 2005]; IFD Constr. Corp. v Corddry Carpenter Dietz & Zack, 253 AD2d 89, 92-93 [1st Dept 1999]).
The Members' claim alleging negligent misrepresentation against the Trustees does not rest on allegations of actual or constructive fraud. While the Complaint includes copious allegations of fraud against the CRM Defendants, the claim against the Trustees is based on their alleged failure to accurately and completely disclose adverse information bearing on the Trust's finances and administration to the Members (see Compl., ¶¶ 372-374; see also infra). As alleged by the Board, the Trustees were mere "figureheads" (id., ¶ 378) who "unreasonably[ and] negligently" violated their duties as Trustees (id., ¶ 365).
Inasmuch as the claim of negligent misrepresentation here is governed by a three-year limitations period, it is time-barred with respect to negligent misrepresentations made and relied upon prior to July 10, 2006. Five of the Trustees — Patrick Borek, Joseph Creador, Donald Larder, Karen Pfeifer and Linda Walleshauser — have submitted affidavits and documentary evidence confirming that their service as Trustees ended prior to such date. As the Board does not controvert the dates of service for these five Trustees,[FN3]
the claim for negligent misrepresentation must be dismissed in its entirety as against these five Trustees.
2. CPLR 3016
The Trustees also contend that the claim of negligent misrepresentation must be dismissed for failure to plead with the requisite particularity.[FN4]
CPLR 3016 (b) requires misrepresentation-based claims to be pleaded with particularity, but this requirement is met when the complaint puts the defendants on notice of the incidents complained of, and the material facts alleged in the complaint, in light of the surrounding circumstances, are sufficient to permit a reasonable inference of the alleged misconduct (see Goel v Ramachandran, 111 AD3d 783, 792-793 [2d Dept 2013]). 
Here, the Board alleges that the Trustees provided inaccurate and/or incomplete information to the Members "with respect to the financial status of the Trust, the risks associated with becoming a member of the Trust, the ongoing risk associated with remaining a member of [*6]the Trust, and the competency of CRM in acting as the administrator of the Trust" (Compl., ¶ 404). The Complaint also makes specific allegations with respect to the Trustees' failure to disclose to the members their concerns with, among other things, the Trust's accounting firm, "which could be manipulated by [CRM];" the Trustees' lack of opportunity to interact with the Trust's auditor; potential problems with a "funding shortfall;" the possibility that CRM could be using the Trust as "a cash cow to another CRM business;" the prospect that the Trust could "go under" if remedial actions were not taken; the "ero[sion]" of the Trust's assets; the failure of CRM to provide the Trustees with sufficient information "to make decisions;" and "lies" made by CRM to the Trustees regarding the Trust's finances (id., ¶¶ 372-374). The Court is satisfied that the foregoing allegations, read in light of the allegations of the Complaint as a whole, are specific enough to satisfy CPLR 3016 (b). 
Accordingly, the branch of the motion seeking dismissal of the claim of negligent misrepresentation under CPLR 3211 (a) (7) and CPLR 3016 (b) is denied.
C. Implied Indemnity
The Trustees seek dismissal of the claim for implied indemnity under CPLR 3211 (a) (7) on the ground that they were under no statutory or contractual duty to personally guarantee the solvency of the Trust.
"Implied indemnity is a restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other" (Mas v Two Bridges Assoc., 75 NY2d 680, 690 [1990]). "The underpinning of indemnity actions is the prevention of unjust enrichment. In cases where such unfairness would arise from the assumption by a third party of another's debt or obligation, a contract to reimburse or indemnify is implied by law" (State of New York v Stewart's Ice Cream Co., 64 NY2d 83, 88 [1984] [internal quotation marks and citation omitted]). As the Court of Appeals explained:
[T]he key element . . . is not a duty running from the indemnitor to the injured party, but rather is a separate duty owed the indemnitee by the indemnitor. The duty that forms the basis for the liability arises from the principle that every one is responsible for the consequences of his [or her] own negligence, and if another person has been compelled to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him [or her]
(Raquet v Braun, 90 NY2d 177, 183 [1997] [internal quotation marks, alterations and citations omitted]).
In Accredited Aides, the Appellate Division, Third Department held that the trustees of a GSIT shared with the former employer-members a "common duty to ensure that the trust maintained adequate reserves to cover employee claims" (147 AD3d at 136-137). Likewise, in Murray Bresky Consultants, Ltd. v New York Compensation Manager's Inc. (106 AD3d 1255 [3d Dept 2013]), the former trust member's claim for implied indemnity against the trustees was sustained "given their common duty to plaintiff's covered employees and to the [WCB] to maintain adequate reserves in the trust so that it was adequately funded and its assets would cover its liabilities" (id. at 1258-1259).
In light of this precedent, the Court must conclude that the Board has sufficiently stated a direct claim for implied indemnity on behalf of the Members. Contrary to the Trustees' contention, the Board need not establish that the Trustees were under a duty to personally [*7]guarantee the solvency of the Trust; rather, as framed by binding authority of the Third Department, the issue is whether the Trustees shared a common duty with the Members to ensure that the solvency of the Trust was maintained. The Third Department found such a duty inherent in the WCL, attendant regulations and the trust instruments, notwithstanding the absence of any obligation of the part of the trustees in Accredited Aides or Murray Bresky to personally guarantee the solvency of their GSITs.
Accordingly, the branch of the motion seeking dismissal of the implied indemnity claim is denied.[FN5]

D. Disqualification
The Trustees moved for disqualification of the Board's counsel from continued representation in this action on the ground that the firm's representation of the "WCB as well as the HITNY Members" creates a "disabling conflict of interest." However, based upon the clarification regarding the Board's role provided at oral argument, the Trustees' counsel acknowledged that the law firm is "not representing anybody but the [Board]. They're not representing the members; and, therefore, I think it moots my point on that" (Oral Arg. Trans., pp. 44-45). Under the circumstances, the Court deems this branch of the motion to have been withdrawn.
UHY's MOTION
A. Negligence
As clarified by the Board's representations at oral argument and in its supplemental attorney affirmation, the cause of action alleging negligence is a derivative claim being prosecuted on behalf of the Trust. For the reasons stated above, the Court concludes that the claim must be dismissed because the Members were divested of standing to maintain such a claim by the Board's commencement of its own actions on behalf of the Trust (see supra).
B. Breach of Contract/Negligent Misrepresentation
In seeking dismissal of the claims for breach of contract and negligent misrepresentation, UHY argues principally that the Board's complaint fails to include sufficient allegations of a near-privity relationship with the Members, particularly with respect to the requirement that plaintiffs allege some affirmative "linking conduct" on the part of the accounting firm. UHY further argues that the Board cannot circumvent the requirement of privity by relying upon a contractual third-party beneficiary theory. 
It is settled law in New York that an accounting firm cannot be held liable to a non-client for its rendition of professional services unless the relationship between the professional firm and the non-client is "sufficiently intimate to be equated with privity" (Credit Alliance Corp. v Arthur Andersen & Co., 65 NY2d 536, 543 [1985]; see Ultramares Corp. v Touche, 255 NY 170, 182-183 [1931, Cardozo, Ch. J.]). To establish such a relationship, "[three] prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was [*8]intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance" (Credit Alliance, 65 NY2d at 551).
The Court concludes that the Complaint fails to allege that the Members were in a near-privity relationship with UHY under the tripartite test established by the Court of Appeals in Credit Alliance. In terms of the Members' relationship with UHY, the Complaint recites, upon information and belief, that "UHY knew that [the Members] would rely on its services to analyze the financial stability of the Trust and to determine whether to become a member of the Trust and/or to continue membership in the Trust based on UHY's opinion of the overall fairness of the financial statements of the Trust" (Compl., ¶ 320; see also id., ¶ 328). The Board further alleges, also on information and belief, that "UHY knew or reasonably anticipated that the statements and representations made in its reports would be communicated to the members of the Trust" (id., ¶ 322; see also id., ¶ 407).[FN6]

Notably absent from the Complaint, however, is any allegation of direct dealings between UHY and the Members or any other affirmative "conduct on the part of the accountants . . . which evinces [UHY's] understanding of [the Members'] reliance" (Credit Alliance, 65 NY2d at 551). Nor is there anything in the engagement letters by which UHY was retained or in the audit reports issued to the Trust that supports a claim of near-privity with the Members. The engagement letters do not refer to the Members in any way; the audit reports were addressed solely to the Trustees; UHY committed in the engagement letters to provide only five copies of its audit reports to the Trust; and the engagement letters precluded the Trust from reproducing or disseminating UHY's audit reports without the express permission of UHY (see Kotlow Aff., Exs. A-C).
Thus, even assuming the truth of Board's factual allegations and constructing them in a light most favorable to the Board, the Complaint merely alleges that UHY knew or should have known that the Members would rely upon its audit reports. But Credit Alliance expressly rejected "a rule permitting recovery by any foreseeable plaintiff," holding instead that there must be some conduct on the part of the accounting firm linking it to the plaintiffs, such as direct dealings with the plaintiffs or specific agreements with the client to provide the reports for the plaintiffs' use or in accordance with their particular requirements (65 NY2d at 553). Indeed, the allegations of near-privity relied upon by the Credit Alliance plaintiffs are essentially the same as made by the Board here: "[T]he complaint and supporting affidavit . . . allege that [the accountant] specifically knew, should have known or was on notice that [plaintiffs] were being shown the reports by . . . [the accountant's] client, in order to induce [plaintiffs'] reliance thereon" (id.).
"Plaintiffs must plead some affirmative conduct by [the accountant] linking it to plaintiffs' alleged reliance, other than the performance of the audit itself" (LaSalle Nat'l Bank v [*9]Ernst & Young, 285 AD2d 101, 107 [1st Dept 2001]). "The 'special purpose' requirement of the first prong [of Credit Alliance], the 'reliance' requirement of the second prong, and the 'linkage' requirement of the third prong . . . are distinct elements. Allegations possibly establishing the first two requirements, which may be satisfied even by the accountant's passivity, do not suffice to establish linkage, requiring the accountant's affirmative conduct" (id.). "Where, as here, direct contact between the accountant and the plaintiff[s] is minimal or nonexistent, the plaintiff[s] cannot recover for the accountant's alleged negligence," and "[t]he fact that plaintiffs were entitled to and received a copy of the audited financial statements, or that [the accountant] knew that the [plaintiffs] would rely upon the information contained in the financial statements, does not establish the requisite linking conduct" (CRT Invs., Ltd. v BDO Seidman, LLP, 85 AD3d 470, 472 [1st Dept 2011]).
In holding that the foreseeability-based allegations of the Complaint fall well short of meeting the rigorous standard for near-privity articulated in Credit Alliance, the Court recognizes that the Appellate Division, Second Department has held that former members of a different GSIT could pursue direct claims against the trust's auditors (see Health Acquisition Corp. v. Program Risk Mgt., Inc., 105 AD3d 1001 [2d Dept 2013]). But, as the First Department recently observed in rejecting arguments similar to those made by the Board here, the ruling in Health Acquisition is contrary to established precedent and relies largely on a decision of the Court of Appeals that expressly was superseded by Credit Alliance (see GSP Fin. LLC v KPMG LLP, 146 AD3d 454, 455 [1st Dept 2017] ["The fact that defendant's (reports), which were addressed to [its client], were intended for the use of plaintiff (among others) does not constitute linking conduct."]). Under the circumstances and in the absence of any precedent from the Third Department speaking directly to the issue, this Court declines to follow the Second Department's decision in Health Acquisition and instead will follow the clear dictates of Credit Alliance and its progeny, including GSP Fin.
The Court further concludes that the Board cannot circumvent the requirement of near-privity by pleading that the Members were the intended third-party beneficiaries of the engagement between the accounting firm and the Trust. The Credit Alliance framework governs claims by non-clients arising from the rendition of professional services, and a non-client cannot avoid the rigorous requirements for recovery established therein by relying upon a contractual theory, rather than one based upon professional negligence. In any event, there is nothing in the engagement letters by which UHY was retained or in the audit reports supplied by UHY to indicate that the retention of the Trust's independent auditor — an engagement mandated by WCB regulations — was intended for the benefit of the Members or that the Members were anything more than incidental beneficiaries of the professional engagement (cf. Accredited Aides, 147 AD3d at 129-130).
Based on the foregoing, the Court concludes that the direct causes of action for breach of contract and negligent misrepresentation must be dismissed as against UHY due to the Board's failure to sufficiently allege a near-privity relationship between the Members and the accounting firm under the tripartite test articulated in Credit Alliance.[FN7]

[*10]D. Implied Indemnity
UHY moves to dismiss the Members' direct cause of action for implied indemnity for failure to a state a claim. In a Coordinated Decision & Order dated February 11, 2016, this Court held that it would be futile for the WCB to amend its complaint in the UHY Action to allege such a claim. In so holding, the Court relied upon its own prior precedent, as well as appellate authorities holding that a claim of implied indemnity will not lie against the professionals who rendered services to the Trusts (see State of NY Workers' Compensation Bd. v Madden, 119 AD3d 1024-1025 [3d Dept 2014]). The Board acknowledges the Court's prior rulings, but simply seeks to preserve the issue. Accordingly, for the reasons previously stated in the Coordinated Decision & Order, the claim for implied indemnification is dismissed in all respects.
CONSOLIDATION
The Board cross-moves for an order consolidating the CRM Actions. The Trustees are the only remaining nonsettling defendants in this action and the Board Action, and UHY is the only remaining nonsettling defendant in the UHY Action. 
In the exercise of discretion, the motions for consolidation made in all three actions are denied. The cases already are coordinated for pretrial purposes pursuant to the LCP's order, and the Board has not demonstrated any tangible benefit to consolidation at this juncture. Further, the time in which to complete disclosure and file a note of issue in the UHY Action has long since passed, whereas disclosure has not yet commenced in this action or the Board Action. 
CONCLUSION
Accordingly, it is
ORDERED that the claims for breach of fiduciary duty, negligence and gross negligence are dismissed as against the Trustees; and it is further
ORDERED that the claim for negligent misrepresentation is dismissed as against Patrick Borek, Joseph Creador, Donald Larder, Karen Pfeifer and Linda Walleshauser; and it is further
ORDERED that the Trustees' motion is granted to the extent indicated in the preceding two paragraphs and denied in all other respects, in accordance with the foregoing; and it is further
ORDERED that the Complaint is dismissed in all respects as against UHY; and finally it is
ORDERED that the motions by the Board for consolidation are denied.
This constitutes the Decision and Order of the Court. The original Decision & Order is being transmitted to plaintiff's counsel for filing and service; all other papers are being transmitted to the Albany County Clerk. The signing of this Decision & Order shall not constitute entry or filing under CPLR 2220, and counsel is not relieved from the applicable provisions of that section respecting filing, entry and Notice of Entry.
Dated: December 14, 2017
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
Notice of Defendant UHY LLP's Motion to Dismiss, dated January 6, 2017, with attached exhibit A;
Memorandum of Law in Support of Defendant UHY LLP's Motion to Dismiss,
dated December 1, 2016;
Affidavit of Richard Kotlow, dated November 28, 2016, with attached exhibits A-D;
Memorandum of Law in Opposition to UHY LLP's Motion to Dismiss, dated February 23, 2017;
Notice of Cross-Motion of Plaintiff, dated February 24, 2017;
Reply Memorandum of Law in Further Support of Defendant UHY LLP's Motion to Dismiss and in Opposition to Cross-Motion of Plaintiff, dated March 24, 2017;
Supplemental Memorandum of Law in Further Support of Defendant UHY LLP's Motion to Dismiss, dated November 20, 2017;
Notice of Motion, dated December 1, 2016;
Memorandum in Support of the HITNY Trustees' Motion to Dismiss the Fifth Amended Complaint and Motion to Disqualify Rupp Baase As Counsel for the HITNY Members, dated December 1, 2016;
Memorandum of Law in Opposition to the HITNY Trustees' Motion to Dismiss, dated February 23, 2017;
HITNY Trustees Omnibus Reply, dated April 10, 2017;
Reply Affirmation of John H. Snyder, Esq., dated April 10, 2017, with attached exhibits 116-120;
Supplemental Affirmation of John H. Snyder, dated December 9, 2016, with attached
replacement exhibits 107-111;
Letter of John H. Snyder, dated November 20, 2017;
Reply Affidavit of Richard Kotlow, sworn to March 21, 2017, with attached exhibits A-B;
Affidavit of David Smeltzer, Esq., sworn to March 18, 2016, with attached exhibits 1-94;
Affirmation of John H. Snyder, Esq., dated December 1, 2016; with attached exhibits 95-115;
Affirmation of Daniel E. Sarzynski, Esq., dated October 19, 2017, with attached Exhibit A;
Affirmation of Daniel E. Sarzynski, Esq., dated February 23, 2017; with attached exhibits A-C and Q;
Affidavit of Michael Papa, Esq., sworn to February 23, 2017, with attached exhibits D-P; and
Transcript of Oral Argument, held on July 21, 2017.



Footnotes

Footnote 1:The Complaint alleges that a pre-suit demand was made (¶ 175), and the WCB submits proof of the same (see Papa Aff., ¶ 50). It is by no means clear, however, whether the WCB actually refused the Members' demand. According to the WCB, "[a]t the time it received the demand, although the Board had requested that the Office of the Attorney General commence such an action on behalf of HITNY, a definitive response had not been received and thus the Board was not in a position to file an action immediately" (id.). This is a far cry from the collusive refusal-to-prosecute contemplated in Robinson.

Footnote 2:In view of this conclusion, there is no need to consider whether the Board should be judicially estopped from asserting that the Members possess derivative standing based upon the representations made to this Court over the years, including representations made subsequent to the assignment of the Members' claims.

Footnote 3:The Board originally took issue with the affidavit submitted by Donald Larder because it was unsupported by documentary evidence, but withdrew that objection at oral argument.

Footnote 4:"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 [2007]).

Footnote 5:The Court has considered the Trustees' remaining contentions in seeking dismissal of the implied indemnity claim, including their contention that the Trust is void due to fraud in its formation, but the Court finds these contentions to be lacking in merit (see Decision & Order dated December 14, 2017, Index No. 10288-09 [decided herewith]).

Footnote 6:In its opposition to the motion, the Board alleges, for the first time, that the negligent misrepresentation claim is founded upon UHY falsely holding itself out as an independent auditor, rather than on the representations made in the audit reports (see WCB's Brief, pp. 17-18). However, the Board does not allege that the Members received (or were aware of) any communications from UHY other than the audit reports.

Footnote 7:In view of this conclusion, the Court need not consider the alternative grounds for dismissal tendered by UHY, including its contention that any claims based on audit reports prior to 2006 are barred
by the three-year limitations period applicable to professional malpractice actions, and any claim based on the 2006 engagement fails because the Members could not have reasonably and detrimentally relied upon an audit report disclosing a Trust deficit of about $76 million and questioning whether the Trust could continue as a going concern.