*Montauk U.S.A., LLC v. 148 South Emerson Associates LLC*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2017

ARGUED: OCTOBER 5, 2017
DECIDED: APRIL 20, 2018

No. 16-3912-cv

MARK HOROWITZ,
*Plaintiff,*

MONTAUK U.S.A., LLC,
*Plaintiff-Appellant,*

*v.*

148 SOUTH EMERSON ASSOCIATES LLC,
*Defendant-Appellee.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 16-cv-02741 – Sandra J. Feuerstein, *Judge.*

————

Before: WALKER, RAGGI, and HALL, *Circuit Judges.*

————

Plaintiff-Appellant Montauk U.S.A., LLC ("Montauk") appeals from (i) the district court's dismissal without prejudice of its Lanham Act claims and motion for preliminary injunction under the "first-filed" rule, and (ii) the district court's order, pursuant to Fed. R. Civ. P. 41(d), that Montauk pay the costs, including attorneys' fees, that Defendant-Appellee 148 South Emerson Associates LLC ("Associates") incurred in responding to a previous action Montauk brought against Associates in Georgia state court that Montauk voluntarily dismissed. Central to Montauk's appeal is the contention that Associates, a limited liability company, should have been held in default because Associates could not litigate through a partial owner who lacked derivative litigation rights under New York law.

Because New York law allows for derivative representation on the facts presented, we conclude at the outset that the district court correctly rejected Montauk's request to hold Associates in default. We nevertheless vacate the district court's dismissal of Montauk's complaint and preliminary injunction motion in favor of a first-filed federal Georgia action because the Georgia suit has been transferred to the Eastern District of New York, so the reasoning behind the first-filed ruling no longer pertains. We affirm the district court's award of costs under Rule 41(d), including attorneys' fees, incurred by Associates in the Georgia state action. Consequently, we AFFIRM in part, VACATE in part, and REMAND for further proceedings.

————

MICHAEL BOWE, Kasowitz Benson Torres & Friedman LLP, New York, NY, *for Plaintiff-Appellant*.

JAMES M. CATTERSON, Arnold & Porter Kaye Scholer, LLP, New York, NY (Michael Burrows, Greenberg Traurig, LLP, New York, NY, *on the brief*), *for Defendant-Appellee*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-Appellant Montauk U.S.A., LLC ("Montauk") appeals from (i) the district court's dismissal without prejudice of its Lanham Act claims and motion for preliminary injunction under the "first-filed" rule, and (ii) the district court's order, pursuant to Fed. R. Civ. P. 41(d), that Montauk pay the costs, including attorneys' fees, that Defendant-Appellee 148 South Emerson Associates LLC ("Associates") incurred in responding to a previous action Montauk brought against Associates in Georgia state court that Montauk voluntarily dismissed. Central to Montauk's appeal is the contention that Associates, a limited liability company, should have been held in default because Associates could not litigate through a partial owner who lacked derivative litigation rights under New York law.

Because New York law allows for derivative representation on the facts presented, we conclude at the outset that the district court

correctly rejected Montauk's request to hold Associates in default. We nevertheless vacate the district court's dismissal of Montauk's complaint and preliminary injunction motion in favor of a first-filed federal Georgia action because the Georgia suit has been transferred to the Eastern District of New York, so the reasoning behind the first-filed ruling no longer pertains. We affirm the district court's award of costs under Rule 41(d), including attorneys' fees, incurred by Associates in the Georgia state action. Consequently, we AFFIRM in part, VACATE in part, and REMAND for further proceedings.

## BACKGROUND[1]

This case is one in a series of bitterly contested suits adjudicating rights associated with The Sloppy Tuna, a restaurant in Montauk, NY. *See* App'x 707–09. In this installment, Montauk, the holding company for intellectual property associated with The Sloppy Tuna, and Montauk's alleged manager, Mark Horowitz, sued Associates, the owner and operator of The Sloppy Tuna, claiming that Associates' use of Montauk's trademarks violates various provisions of the Lanham Act.

---

[1] These facts derive principally from the complaint and we accept them as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Further, the records and decisions in the various judicial proceedings involving the parties and their constituent members are facts of which we may take judicial notice. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424–25 (2d Cir. 2008).

The individual players at the heart of the suit, Drew Doscher, Michael Meyer, Stephen Smith, and Michael Meagher, are former business partners at The Seaport Group, a Wall Street investment firm. They and their respective entities share a long history, the relevant parts of which we discuss below.

In 2010, Doscher pioneered the idea for The Sloppy Tuna while working at The Seaport Group and sought out as partners and investors then-colleagues Meyer, Smith, and Meagher. Doscher thereafter formed Montauk, a Georgia limited liability company of which he always has been the sole member. Doscher created Montauk as a vehicle to hold The Sloppy Tuna's intellectual property and to license that intellectual property to Associates for use at the restaurant.

In March 2011, Doscher, Meyer, Smith, and Meagher together formed two New York limited liability companies: (i) Associates, to own and operate The Sloppy Tuna; and (ii) 148 South Emerson Partners, LLC ("Partners"), to purchase the property on which The Sloppy Tuna would operate. Following various ownership disputes not relevant here, the stakeholders in The Sloppy Tuna consist of: (i) Montauk, with Doscher as the sole 100% partner; (ii) Associates, with Meyer and Doscher as 50% partners; and (iii) Partners, with Doscher, Meyer, Smith, and Meagher each as 25% partners.

In May 2011, The Sloppy Tuna opened for business. At that time, Montauk, wholly owned and controlled by Doscher, began to successfully register several trademarks specifically designed for The Sloppy Tuna with the United States Patent and Trademark Office. *See* App'x 42, 44–49. According to the complaint, Montauk subsequently permitted Associates to use those trademarks for The Sloppy Tuna subject to an oral licensing agreement. App'x 11, 36; *see also* App'x 234. The parties operated under this arrangement for several years, during which time the restaurant enjoyed considerable success.

In January 2013, however, conflict erupted between the partners and The Seaport Group abruptly ended its relationship with Doscher. *See generally Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372 (2d Cir. 2016). The record evinces the open and personal hostility between the parties, most especially between Doscher and Meyer. *See* App'x 629, 631.

On October 18, 2013, amidst this conflict, Montauk and Associates entered into a written license agreement regarding Associates' use of Montauk's Sloppy Tuna marks (the "License Agreement"). App'x 35–41. The License Agreement's stated aim was to "effectively" and "clearly memorialize" Montauk and Associates' pre-existing oral agreement given that the parties "may be suffering from some form of internal disagreement." App'x 36. Horowitz signed on behalf of Montauk, and Doscher, who owned 100% of

Montauk and was a 50% partner in Associates, signed the License Agreement on behalf of Associates. Meyer, the other 50% partner in Associates, however, did not sign the License Agreement, which required Associates to pay Montauk for use of the marks, and provided that, upon the termination of the agreement, the license "shall immediately cease, [and Associates] shall immediately discontinue all use of the [m]arks." App'x 37–38. Associates and Meyer have consistently contended that the License Agreement is a sham and is unenforceable.[2]

In 2014, Doscher, Meyer, Smith, and Meagher, as individuals and through their respective entities, began litigating in various fora numerous issues related to the ownership and operation of The Sloppy Tuna. Pertinent to the issues on appeal are the following four lawsuits, each adjudicating the rights to the intellectual property that is the subject of the instant action.

*First*, on December 23, 2014, Montauk brought a declaratory judgment action in the Northern District of Georgia against Associates seeking a ruling that Montauk owns the relevant trademarks and that Associates does not. As will be discussed, on

---

[2] Following Montauk's filing of its opening brief on this appeal, the New York state court ruled that the License Agreement is "void, invalid and of not [*sic*] force or effect." *Meyer v. Montauk U.S.A., LLC*, No. 600830/2015, Dkt. No. 239 at 10 (N.Y. Sup. Ct. May 9, 2017).

August 14, 2017, more than two and one-half years later, the Georgia federal action was transferred to the Eastern District of New York.

*Second*, on January 29, 2015, Meyer sued Montauk in New York state court alleging that the License Agreement was not a valid arms-length agreement and is therefore void *ab initio*, which ultimately resulted in the Georgia federal action being stayed. On February 19, 2015, because Doscher and Meyer were deadlocked as co-owners of Associates, the court appointed a temporary receiver (Receiver) for Associates. On March 16, 2016, after Doscher failed to fully comply with the Receiver, the New York state court further ordered that: (i) the Receiver shall take full control of The Sloppy Tuna; (ii) Doscher must surrender all of his restaurant-related property to the Receiver; and (iii) Doscher is "restrained from interfering in any way with the Court-appointed Temporary Receiver in his operation and management of the company." App'x 134. Shortly thereafter, on March 24, 2016, Montauk terminated the License Agreement purportedly because the New York state court's order wrested too much control of the restaurant from Doscher.

*Third*, on March 24, 2016, Montauk sued Associates in Georgia state court for breach of contract, unjust enrichment, and quantum meruit, relating to Associates' continued use of The Sloppy Tuna marks following Montauk's termination of the License Agreement. Montauk simultaneously moved for a temporary restraining order

(TRO) and preliminary injunction (PI). On April 26, 2016, that court, after a hearing, denied the TRO and at the same time suggested that Montauk's filing of that action interfered with the state action in New York in violation of that court's March 16, 2016 order. App'x 588. Two days later, on April 28, 2016, Montauk voluntarily dismissed the state action in Georgia.

*Fourth* and lastly, on May 31, 2016, Montauk and Horowitz brought the instant action against Associates in the Eastern District of New York. They alleged that Associates' continued use of The Sloppy Tuna marks after termination of the License Agreement violated several provisions of the Lanham Act. Montauk and Horowitz asserted four claims: (i) trademark infringement, 15 U.S.C. § 1114; (ii) false designation of origin and unfair competition, 15 U.S.C. § 1125(a); (iii) cybersquatting, 15 U.S.C. § 1125(d); and (iv) trademark dilution, 15 U.S.C. § 1125(c). Montauk and Horowitz sought recovery only for Associates' use of The Sloppy Tuna marks after March 24, 2016, the date Montauk terminated the License Agreement.

On July 1, 2016, Montauk and Horowitz moved for a TRO and PI in the instant action. That same day, the TRO was denied, and attorneys James M. Catterson and Michael Burrows filed notices of appearance "for Michael J. Meyer, derivatively on behalf of Defendant 148 South Emerson Associates." App'x 220–21. No other counsel appeared for Associates. Days later, Meyer, on behalf of

Associates, filed a motion to dismiss, raising three arguments: (i) the complaint must be dismissed under the "first-filed" rule in favor of the earlier-filed and still extant federal action Montauk brought in Georgia; (ii) Montauk and Horowitz failed to state their cybersquatting claim; and (iii) Montauk should be ordered to pay the costs, including attorneys' fees, Associates incurred defending the discontinued state action in Georgia under the anti–forum shopping provision of Fed. R. Civ. P. 41(d).

Meyer, on behalf of Associates, also responded to Montauk and Horowitz's PI motion, arguing that Montauk and Horowitz failed to meet the standard for such relief. In reply, Montauk and Horowitz argued not only that they had met the standard, but that the district court should disregard any submissions filed by Meyer on behalf of Associates. Specifically, they argued that "[t]here is no basis for a non-party [such as Meyer] to defend this action 'derivatively' simply because it disagrees with the Receiver's business judgment or seeks to litigate with plaintiffs for its own self-interested reasons." No. 16-cv-02741, Dkt. No. 18 at 4 (E.D.N.Y. July 13, 2016). Because Meyer's "derivative" submissions were not properly before the court, Montauk and Horowitz contended, and Meyer's was the only opposition to the PI motion, the court should have granted the PI motion by default. Meyer filed a sur-reply, still purportedly on behalf of Associates, attaching a declaration of the New York state court

Receiver, Charles C. Russo, in which he stated that he eagerly consented to Meyer's derivative defense of the case and that, in his judgment, Meyer's derivative representation was in Associates' best interest. App'x 665–68.

On October 19, 2016, the district court resolved the pending motions substantially[3] in Associates' favor and dismissed the action. Special App'x ("SA") 1–31. *First*, the district court rejected Montauk and Horowitz's contention that Meyer did not have a derivative right to defend on behalf of Associates under New York law. SA 19–22. *Second*, the district court dismissed Montauk and Horowitz's complaint without prejudice under the "first-filed" rule based on the action's similarity to the earlier-filed federal action in Georgia. SA 22–26. It followed that the district court denied without prejudice Montauk's PI motion. SA 26 n.10. *Third*, the district court ordered Montauk to pay the costs, including attorneys' fees, incurred by Associates in defending the Georgia state action under Rule 41(d). SA 26–30. Montauk, but not Horowitz, appealed.

**DISCUSSION**

Montauk contends on appeal that the district court erred in three ways: (i) allowing Meyer to defend the suit derivatively on

---

[3] The district court did not resolve the aspect of Associates' motion seeking dismissal of Montauk and Horowitz's cybersquatting claim (Count III) for failure to state a claim.

behalf of Associates; (ii) dismissing the action under the "first-filed" rule; and (iii) awarding Associates costs under Rule 41(d). Associates argues that all three rulings were correct.

We conclude that controlling New York law provides Meyer with derivative rights to defend this suit on behalf of Associates and we therefore find no error in the district court's consideration of Associates' submissions. We conclude, however, that the district court's dismissal of the complaint under the "first-filed" rule should be vacated in light of the subsequent transfer of the Georgia federal action to the Eastern District of New York. We therefore vacate the dismissal of Montauk's complaint, which restores the preliminary injunction motion which was never decided. We affirm in full, however, the awarding of costs under Rule 41(d), including attorneys' fees, to Associates that relate to its defense of the previously discontinued Georgia state action.

## I.    Meyer's Derivative Right to Defend

The district court rejected Montauk's contention that Meyer has no right to defend this suit derivatively on behalf of Associates. The district court did so by looking to state law, specifically, New York's rules for derivative representation. The district court noted New York's general disfavor of derivative litigation, but identified an exception:  New York law will allow for derivative representation in certain contexts to avoid the "intolerable grievance" created where a

corporate entity refuses to act and a stakeholder is left without a remedy. SA 20–21. The district court concluded that to reject Meyer's right to defend derivatively here would be an "intolerable grievance," where one of the two 50% "owners of a[n] [LLC] cause[d] his wholly-owned company, and the purported manager of that company, to commence a lawsuit against th[at] LLC." SA 20. Stated differently, the district court concluded that to enter default against the LLC in this instance would be inequitable because it would effectively require the LLC to pay license fees to one 50% member (Doscher) at the expense of the other 50% member (Meyer) who would be barred from appearing in the suit.

The district court correctly concluded that New York law governs whether Meyer may derivatively defend Associates in this matter. *See* Fed. R. Civ. P. 17(b)(3); *see also Allright Missouri, Inc. v. Billeter*, 829 F.2d 631, 635 (8th Cir. 1987).[4] The district court's assessment being an interpretation and application of state law, we

---

[4] Rule 17(b)(3) provides in relevant part that "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located." At first glance, one could question whether this provision applies because Meyer is not "be[ing] sued" in this action. However, "[c]apacity has been defined [under Rule 17(b)] as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest or is the real party in interest. Generally, capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense being asserted." Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1559 (3d ed. 2017) (footnotes omitted).

review it *de novo*. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63 (2d Cir. 2017); *see also Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992).

Under New York law, a shareholder has no general right to litigate on behalf of a corporation. *See* N.Y. Bus. Corp. Law ("BCL") § 626. Such derivative litigation is disfavored "because [it] ask[s] courts to second-guess the business judgment of the individuals charged with managing the company." *Bansbach v. Zinn*, 1 N.Y.3d 1, 8 (2003). Under certain conditions, however, a shareholder may litigate to vindicate corporate rights. BCL § 626(c). The principal condition is that the putative derivative litigant attempt to get the corporate board to act or, alternatively, explain why such an attempt should be excused. *Id.* The same principle applies when a receiver is in charge. *O'Brien v. King*, 17 N.Y.S.2d 44, 45 (1st Dep't 1940) (where a corporation is run by a receiver, such pre-suit demand must be made on that receiver, which "stands in the place of the managing body"). The demand component stems from the requirement that a derivative litigant demonstrate "a sufficient excuse" as to why it should be allowed to overcome the board's business judgment and represent the interests of the corporation. *See Tzolis v. Wolff*, 10 N.Y.3d 100, 108 (2008) (quoting *Robinson v. Smith*, 3 Paige Ch. 222, 232–33 (N.Y. Ch. 1832)). This is because, at its core, the issue is whether the litigation decision of the governing board represents the interests of

the shareholders. *See Auerbach v. Bennett*, 47 N.Y.2d 619, 628 (1979). The "real question is one of proper representation." *Id.* The New York Court of Appeals has also made clear that these rules as to derivative rights apply with equal force to LLCs and their members. *See Tzolis*, 10 N.Y.3d at 103.

The question here is whether these derivative representation rules allow Meyer to represent Associates' interests in defense against the instant suit. Montauk contends the answer is no, arguing that derivative representation is unavailable on the present facts. It rests its argument on two asserted principles of New York law: (i) derivative representation is available only where a managing body's decision not to litigate was negligent, fraudulent, or in bad faith, a showing that Meyer has not made as to Associates; and (ii) derivative representation rights do not extend to litigation *defense*. Finding no support for either principle, we conclude that Meyer was free to derivatively defend this case on behalf of Associates.

Montauk cites no authority, and we are aware of none, intimating that derivative representation is only permissible under New York law where a managing body's decision not to litigate was negligent, fraudulent, or in bad faith. *Tomczak v. Trepel*, 724 N.Y.S.2d 737 (1st Dep't 2001), cited repeatedly by Montauk for this proposition, is instructive. There, the First Department affirmed the dismissal of a derivative suit because the plaintiffs failed to allege sufficient

wrongdoing on the part of the board. *Id.* at 738. Contrary to Montauk's contention, however, the court did not imply that board wrongdoing was the only avenue to derivative representation; it simply addressed the board's wrongdoing because that was the reason the plaintiffs proffered in that case for why the board was not properly representing the interests of the shareholders. *Tomczak* makes clear that, at bottom, the inquiry in a derivative rights question is an assessment of the managing body's intent in adopting a litigation strategy. That the plaintiffs failed to adduce facts relevant to that inquiry is evidenced from the following statement:

> While plaintiffs allege that unsuccessful demands were made on the Club's Board of Directors to initiate legal action, the complaint provides no indication as to who made the demands, when they were made, which Board members they were made to, the content of the demands *or why the Board refused to take action*.

*Id.* (emphasis added).

If the board or other managing body's intent in making its litigation decision was to further the interests of the shareholders, New York courts defer to that choice. If its intent was otherwise, they may not.

With this basic principle in mind, it becomes clear that there is little sense in a rule that confines derivative representation to situations where a managing body's decision not to litigate is made

with some malfeasance. The flaw in Montauk's contention is notably apparent in the present context, which is distinct from the usual derivative standing question in a significant way: the derivative litigant and the company here fully agree as to the best litigation strategy, specifically, that Meyer defend the action. New York's concerns behind its general reluctance to allow derivative litigation are simply not present in this case.

A board's malfeasance becomes relevant only where the board and the shareholder disagree as to the path forward, *i.e.*, where the corporation affirmatively "decide[s] to terminate" litigation that the shareholder desired, *Amalgamated Sugar Co. v. NL Industries, Inc.*, 825 F.2d 634, 641 (2d Cir. 1987), or "decline[s] to institute . . . an action" "that the plaintiff [shareholder] has requested the receiver to maintain," *Koral v. Savory, Inc.*, 276 N.Y. 215, 219–20 (1937). This is because, as discussed, New York law looks to a board's malfeasance only to the extent it may provide a reason to reject the board's chosen litigation strategy in favor of a different one proposed by a shareholder.

But, we have no battle here between conflicting litigation positions and therefore no need to show the Receiver's malfeasance. The Receiver—which is obligated as a fiduciary to act in the best interest of Associates, *see Insurance Co. of N. Am. v. City of New York*, 71 N.Y.2d 983, 985 (1988)—wholly and eagerly consents to Meyer's

derivative defense. The Receiver explained in the record its insistence that it was in the best interest of Associates for Meyer to defend this litigation. App'x 666, 672. This decision is properly subject to the business judgment rule, and it makes no difference that the governing corporate entity is a receiver. *See Golden Pac. Bancorp v. F.D.I.C.*, 2002 WL 31875395, at *9 (S.D.N.Y. Dec. 26, 2002) (under New York law, "receivers, just like corporate directors, are entitled to the deference of the business judgment rule"). Montauk does not contend that Meyer's derivative defense is somehow counter to the interests of Associates or that the Receiver's decision to allow Meyer to defend this case was itself made in bad faith. In sum, Montauk's argument that Meyer was required to demonstrate malfeasance on the part of the Receiver was properly rejected by the district court.

Montauk also argues that even if LLC members may bring derivative lawsuits, they may not derivatively *defend* lawsuits. Montauk cites no law, or reasoning, to support this contention, and the argument is not pressed in its reply brief. The argument is meritless nonetheless. As discussed, the core question in a derivative litigation inquiry is who is a proper entity to represent the company's interests. There is no reason for different rules for that question when the company defends against rather than brings a suit.

In sum, Meyer both (i) took efforts to get Associates to defend the action, BCL § 626(c); and, once Associates elected not to defend

the action, (ii) adequately explained why he should be allowed to derivatively defend it: Associates' good-faith and well-reasoned consent. Meyer therefore met the obligations imposed on him by New York law to derivatively defend this lawsuit.

## II.    The "First-Filed" Rule

The district court dismissed Montauk's complaint without prejudice under the "first-filed" rule, which provides that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 722 (2d Cir. 2010) (internal quotation marks omitted). The rule "embodies considerations of judicial administration and conservation of resources, and recognizes that a party who first brings an issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter." *Id.* (internal quotation marks and citation omitted).

The district judge, over Montauk's objection, concluded that the instant action should give way to the Georgia federal action under the "first-filed" rule. On August 14, 2017, however, the district court judge presiding over the Georgia federal action transferred that case to the Eastern District of New York where it was assigned to the district judge in this case. No. 17-cv-4747, Dkt. Nos. 103–04 (E.D.N.Y.

Aug. 14 & 16, 2017). Consequently, none of the considerations motivating the district court's application of the "first-filed" rule remain. The "first-filed" rule has no import where, as here, the two cases at issue reside on the docket of the same district judge. The able district judge is perfectly capable of consolidating them as necessary. We therefore vacate the district court's dismissal of this action under the "first-filed" rule, as well as its dismissal of Montauk's motion for a preliminary injunction.

**III.    Associates' Rule 41(d) Motion**

The district court concluded that Montauk must pay Associates the costs, including attorneys' fees, it incurred in the Georgia state action pursuant to Rule 41(d), which provides that:

> If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court . . . may order the plaintiff to pay all or part of the costs of that previous action.

Fed. R. Civ. P. 41(d). The district court concluded that Rule 41(d) was implicated due to the similarities in the allegations and relief sought as between the instant action and the Georgia state action, for which Montauk did not "demonstrat[e] that there was a good reason . . . to dismiss." SA 28–29. We review the question of whether specific types of costs are available under a given statute *de novo* and the decision

whether to grant costs for abuse of discretion. *See Gortat v. Capala Bros.*, 795 F.3d 292, 295 (2d Cir. 2015) (per curiam).

Montauk asserts that there are two errors in the district court's analysis. *First*, it argues that the district court abused its discretion in concluding that the instant action is "based on or includ[es] the same claim" as the Georgia state action. *Second*, it argues that even if Associates is entitled to costs under Rule 41(d), the district court erred in concluding that attorneys' fees may be awarded as part of such costs. Neither argument is persuasive.

**a. The District Court Did Not Abuse its Discretion in Concluding that the Instant Action is "[B]ased on . . . the [S]ame [C]laim[s]" as the Georgia State Action**

It is quite clear to us that the instant action is "based on . . . the same claim[s]" as the Georgia state action. Montauk's claims in both actions depend on the same core showing about the same trademarks: that Associates has no legal ownership of or right to use The Sloppy Tuna marks. If Associates owns the marks or otherwise has rights to their use, Associates likely neither breached the License Agreement (the subject of the Georgia state action) nor violated the Lanham Act (the subject of the instant action). On the other hand, if Montauk owns the marks or if Associates had no right to their use, Associates may have breached the License Agreement or violated the Lanham Act. The different assertions in these actions are certainly "based on" the same underlying claims of ownership and use rights.

Montauk's arguments to the contrary are unpersuasive. Montauk points to the fact that the Georgia state action was contract-based and the instant action is brought under the Lanham Act. That two actions involve different theories of recovery, however, is not dispositive for Rule 41(d), as its plain language—"*based on* . . . the same claim"—makes clear. This is most especially the case here, where Montauk could have asserted a Lanham Act violation in the Georgia state action by simply amending its complaint. *See, e.g., Corps Grp. v. Afterburner, Inc.*, 779 S.E.2d 383, 386 n.3 (Ga. Ct. App. 2015). Rather, Montauk chose instead to voluntarily dismiss the Georgia state action and file its Lanham Act claims in federal court in another state. Moreover, it did so immediately after the Georgia state court stated its belief that the action was meritless and that its filing likely contravened an order of another court, which was itself addressing substantially related claims. This is the precise type of litigation tactic that Rule 41(d) is meant to deter. *See Andrews v. America's Living Ctrs., LLC*, 827 F.3d 306, 309 (4th Cir. 2016) ("[T]he purpose of Rule 41(d) is to serve as a deterrent to forum shopping and vexatious litigation." (internal quotation marks omitted)).[5]

---

[5] We are not alone in our view that Montauk's actions in relation to the Georgia state action were part of a pattern of vexatious litigation. While this appeal was pending, the justice presiding over the New York state action held Montauk's counsel in contempt in part for his filing of the Georgia state action. *Meyer v. 148 S. Emerson Assocs. LLC*, No. 068379/2014, Dkt. No. 1355 (N.Y. Sup. Ct. May 9, 2017).

Montauk's other contention that the actions are distinct for purposes of Rule 41(d) is that the instant action seeks relief only for infringements that occurred after the filing of the Georgia state action. Specifically, Montauk points out that because it filed the Georgia state action on March 24, 2016, the same day that it unilaterally terminated the License Agreement, "none of the alleged trademark infringement, dilution, or cybersquatting had taken place at the time the [Georgia state action] was filed." Br. of Appellant at 41. This argument, although perhaps clever, fares no better.

The record makes clear that Associates has utilized the at-issue marks at the restaurant and elsewhere since opening without interruption and with Montauk's knowledge. Consequently, Montauk knew when it filed its Georgia state action that, under its theory, Associates would be in violation of the Lanham Act from March 25, 2016 onward, yet it neither sought Lanham Act relief in the Georgia state action nor sought to amend its complaint prior to its voluntary dismissal. In sum, that certain alleged acts occurred after the filing of the Georgia state action does not alter the underlying claim upon which both actions are based: that Associates did not own and had no right to use The Sloppy Tuna trademarks.

Finally, relying on *Phunware, Inc. v. Excelmind Group Ltd.*, 117 F. Supp. 3d 613 (D. Del. 2015), Montauk argues that the instant action is not sufficiently related to the Georgia state action for purposes of Rule

41(d) because Montauk seeks distinct relief in each action. The argument is meritless. For one, in *Phunware*, the plaintiff had a good-faith concern that the relief sought in the second-filed action, money damages, would have been unavailable in the first-filed forum, a court of equity, *id.* at 623–24 & n.9, and Montauk makes no showing that there was a form of relief available in the Eastern District of New York that was unavailable in the Georgia state court. More fundamentally, however, Montauk did not seek different relief in the two relevant actions; in both, Montauk sought injunctive relief and damages.

The district court did not abuse its discretion in granting Associates' Rule 41(d) motion.

### b. The District Court Did Not Err in Awarding Associates Attorneys' Fees as Part of Costs

As discussed, Rule 41(d) allows a district court to order plaintiffs "to pay all or part of the costs of that previous action." Fed. R. Civ. P. 41(d). Montauk challenges the district court's conclusion that "costs" in Rule 41(d) may include attorneys' fees.

We have not addressed whether attorneys' fees are available as part of "costs" under Rule 41(d). The issue has split our sister circuit courts. The Sixth Circuit has concluded in light of Rule 41(d)'s silence as to attorneys' fees that such fees are never available under the rule. *See Rogers v. Wal-Mart Stores*, 230 F.3d 868, 874 (6th Cir. 2000). On the

other hand, the Eighth and Tenth Circuits have concluded without much discussion that attorneys' fees may be awarded under Rule 41(d). *See Evans v. Safeway Stores, Inc.*, 623 F.2d 121, 122 (8th Cir. 1980) (per curiam); *Meredith v. Stovall*, 216 F.3d 1087 (10th Cir. 2000) (unpublished). The Fourth, Fifth, and Seventh Circuits have taken a hybrid approach and concluded that attorneys' fees may not generally be awarded as costs under the rule, but with an exception for when the statute serving as the basis for the original suit itself allows for attorneys' fees (such as 42 U.S.C. § 1983). *See Andrews*, 827 F.3d at 309–12 (adopting rule from *Esposito v. Piatrowski*, 223 F.3d 497, 501 (7th Cir. 2000)); *Portillo v. Cunningham*, 872 F.3d 728, 738–39 (5th Cir. 2017). For the reasons that follow, we agree with the outcomes arrived at by the Eighth and Tenth Circuits: district courts may award attorneys' fees as part of costs under Rule 41(d).

There is no uniformity across federal authorities as to whether the term "costs" includes attorneys' fees. For example, the term "costs" in Rule 39 of the Federal Rules of Appellate Procedure, as well as an earlier version of 28 U.S.C. § 1927, have both been determined *not* to incorporate attorneys' fees. *See Hines v. City of Albany*, 862 F.3d 215, 220–21 (2d Cir. 2017); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759 (1980). But, the term "costs" in Rule 54(d) of the Federal Rules of Civil Procedure is written such that it includes attorneys' fees. *See Andrews*, 827 F.3d at 311 n.2. For other rules, such as Rule 68 of the

Federal Rules of Civil Procedure and Rule 7 of the Federal Rules of Appellate Procedure, "costs" includes attorneys' fees in certain instances, but not in others, specifically, such fees can be awarded where the cause of action under which the suit at issue is brought so allows, but not otherwise. *See Marek v. Chesny*, 473 U.S. 1, 9 (1985); *Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998). *See generally Marek*, 473 U.S. at 43–51 (Brennan, *J.* dissenting) (listing over 100 statutes with varying usages of the term "attorney's fees" relative to "costs").

Two relevant lessons emerge from the case law on how to assess the availability of attorneys' fees pursuant to a provision, such as Rule 41(d), which allows for "costs" but makes no express reference to attorneys' fees. *First*, "costs" do not include attorneys' fees where the rule incorporates a statutorily enumerated list of "costs" that itself omits attorneys' fees. *See Hines*, 862 F.3d at 220–21. In *Hines*, for example, we concluded that the term "costs" in Rule 39 of the appellate procedure rules does not include attorneys' fees because the advisory committee notes to the rule refer to the definition of "costs" in 28 U.S.C. § 1920, which does not include attorneys' fees in its enumerated list of costs. *Id.* The Supreme Court took a similar tack in *Roadway Express*, where it held that the definition of "costs" in 28 U.S.C. § 1920 should be incorporated into the then-operative version of 28 U.S.C. § 1927's cost-shifting provision because the two provisions, given their shared history, "should be read together as

part of [an] integrated statute." 447 U.S. at 760. Here, Rule 41(d) incorporates no other definition of costs, either expressly or by reference, and therefore attorneys' fees are not precluded by this principle.

*Second*, in this situation—where the term "costs" is entirely undefined, either expressly or by reference—we look to see "if the statute otherwise evinces an intent to provide for [attorneys'] fees." *Key Tronic Corp. v. United States*, 511 U.S. 809, 815 (1994). Consequently, we disagree with the Sixth Circuit's conclusion that attorneys' fees are unavailable under Rule 41(d) "simpl[y] [because] the rule does not explicitly provide for them." *Rogers*, 230 F.3d at 874. In *Marek*, for example, "given the importance of 'costs' to the Rule," the Court "infer[red]" "that the term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or other authority" on which the claimant brought suit. 473 U.S. at 9; *see infra* note 6.

Here, as the great weight of district court authority has concluded in this circuit, *see Pelczar v. Pelczar*, 2017 WL 3105855, at *2 (E.D.N.Y. July 20, 2017) (collecting cases), the entire Rule 41(d) scheme would be substantially undermined were the awarding of attorneys' fees to be precluded. We thus have no difficulty in concluding that Rule 41(d) evinces an unmistakable intent for a district court to be free, in its discretion, to award attorneys' fees as part of costs.

Rule 41(d)'s purpose is clear and undisputed: "to serve as a deterrent to forum shopping and vexatious litigation." *Andrews*, 827 F.3d at 309 (quoting *Simeone v. First Bank Nat'l Ass'n*, 971 F.2d 103, 108 (8th Cir. 1992) and citing *Esposito*, 223 F.3d at 501); *Adams v. N.Y. State Educ. Dep't*, 630 F. Supp. 2d 333, 343 (S.D.N.Y. 2009); 8 Moore's Fed. Prac. § 41.70[1] (3d ed. 2016). Rule 41(d) would be greatly limited as an effective deterrent if district courts were precluded from assessing attorneys' fees as part of costs.[6] The need for attorneys' fees may be

---

[6] We choose not to join the Fourth, Fifth, and Seventh Circuits in adopting a rule based on *Marek* in which attorneys' fees are available under Rule 41(d) only if the underlying cause of action itself allows for attorneys' fees. We think such a rule makes little sense as to Rule 41(d), where there is no connection between the underlying cause of action and the behavior the rule seeks to influence. Pegging the scope of the incentive to the underlying cause of action might make sense in the context of Rule 68, which is meant to encourage settlement, *see Marek*, 473 U.S. at 5, because a parties' incentives to settle are tied to the amount of available recovery. *See id.* ("Rule [68] prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits."); *see also Adsani*, 139 F.3d at 73–75. As discussed, however, the purpose of Rule 41(d) is to deter litigants from forum shopping or filing vexatious suits, acts largely untethered to the merits. The hybrid rule therefore places an arbitrary condition on the Rule 41(d) deterrent. For example, attorneys' fees are allowed to prevailing parties under federal anti-discrimination statutes but not under certain New York anti-discrimination statutes, which are "essentially the same" as their federal counterparts. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913–14 (2d Cir. 1997) (disallowing attorneys' fees to victorious plaintiff where her claim under the federal Age Discrimination in Employment Act, which allows for the recovery of attorneys' fees, was dismissed and plaintiff only recovered on her claim under the New York State Human Rights Law, which "does not provide for an award of [attorneys'] fees"). Under the

especially acute in the Rule 41(d) context. The targets of deterrence under the rule will often be litigants, such as Montauk, that file complaints and quickly dismiss them, perhaps in reaction to initial unfavorable rulings, or hoping for a subsequent case assignment to a judge they view as more favorable. These are actions with minor costs to the adversary other than attorneys' fees, which may be substantial. Indeed, such actions will rarely incur most of the expenses routinely recoverable as costs. *See* 28 U.S.C. § 1920. The instant case is an apt example. Apart from attorneys' fees, the only costs paid by Associates in defense of the Georgia state action were a $15.00 charge for delivery of documents and a $60.48 charge for a transcript fee from a court reporter. *See* No. 16-cv-2741, Dkt. No. 36-5 at 10 (E.D.N.Y. Nov. 17, 2016). We are wholly unconvinced such small payments would effectively deter litigants such as Montauk from forum shopping or otherwise embarking on a course of vexatious litigation. We affirm the district court's ruling on Associates' Rule 41(d) motion.

## CONCLUSION

We find the parties' remaining contentions to be without merit, and, for the reasons stated above, we AFFIRM in part and VACATE

---

hybrid approach, Rule 41(d) would therefore place a larger deterrent on vexatious federal discrimination suits than on vexatious New York discrimination suits. We see no basis for this distinction.

in part the judgment of the district court and REMAND for proceedings consistent with this opinion.